[No. A082472. First Dist. Div. Three. May 23, 2000.]

RINGLER ASSOCIATES INCORPORATED, Plaintiff and Appellant, v. MARYLAND CASUALTY COMPANY et al., Defendants and Respondents.

COUNSEL

Dale E. Fredericks for Plaintiff and Appellant.

Wright, Robinson, Osthimer & Tatum, James C. Nielsen and Thomas H. Nienow for Defendants and Respondents.

OPINION

**McGUINESS, P. J.**—Ringler Associates Incorporated (Ringler) appeals from summary judgment granted in favor of respondents Maryland Casualty Company (Maryland) and Northern Insurance Company of New York (Northern). The trial court found that under a "first-publication" exclusion clause contained in a general liability insurance policy respondents had issued to Ringler, respondents had no duty to defend or indemnify certain defamation claims asserted against Ringler in two underlying lawsuits. On appeal, Ringler contends: (a) the trial court erred in construing the first-publication exclusion broadly to bar coverage for defamatory utterances or publication of material whose first publication allegedly took place before the inception of the insurance policy; (b) respondents breached their duty to defend; (c) respondents are liable to indemnify Ringler for a share of its settlement costs; (d) by failing adequately or promptly to reserve their rights, respondent insurers waived any right to withdraw from Ringler's defense; and (e) respondents were procedurally barred from unilaterally withdrawing from Ringler's defense. None of Ringler's contentions are meritorious, and we therefore affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Ringler is in the business of providing consulting and annuity brokerage services in connection with the purchase of annuities used to fund structured settlements of personal injury cases.[1] Ringler obtained a general commercial liability insurance policy, No. EPA10078278 (the Policy), effective from

---

[1]As defined in the underlying lawsuits against Ringler out of which the claims at issue arose, "a 'structured settlement' is a settlement which provides in whole or in part for periodic payments by the liable party or its liability insurer . . . to the injury victim in satisfaction of his or her claim." For purposes of the underlying lawsuits, the two relevant product markets are (a) annuities sold to fund such structured settlements of personal injury claims; and (b) professional consulting services provided to injury victims, their attorneys, or liability carriers using annuities to fund structured settlements of personal injury claims. The use of structured settlements to fund personal injury claims has become much more common since the Internal

June 4, 1990, to June 4, 1991,[2] from Maryland and Northern.[3] In addition to providing traditional coverage for bodily injury and property damage, the Policy provided coverage for "personal injury" and "advertising injury," defined to include various forms of commercial defamation or trade libel and slander, "but only if the offense was committed in the 'coverage territory' during the policy period."

The Policy defines "personal injury" as "injury other than 'bodily injury,' arising out of one or more of the following offenses: [¶] . . . [¶] d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." The term "advertising injury" is defined in identical language. In either case, coverage is limited to slanders and other defamations committed or published *during* the one-year period between June 4, 1990, and June 4, 1991; the Policy specifically *excludes* coverage for any such libel, slander or disparagement "[a]rising out of oral or written publication of *material whose first publication took place before the beginning of the policy period.*"[4] (Italics added.) In other words, the Policy expressly does not cover republication

---

Revenue Service issued several rulings in 1977 and 1979 to the effect that all moneys received by an injured party pursuant to a qualified structured settlement are tax exempt.

[2]The Policy period of June 4, 1990, to June 4, 1991, appears on the face of the insurance Policy itself. Ringler also stated this as the Policy period in its original complaint, filed on December 26, 1996. Nevertheless, Ringler has subsequently claimed various slightly later termination dates for the Policy period, including July 4, 1991, and even July 31, 1991. Based on the language of the Policy itself and Ringler's own judicial admissions in its original complaint, we treat the Policy period of June 4, 1990, to June 4, 1991, as being conclusively established.

[3]The Policy itself bears the names of both Maryland and Northern, and refers throughout to the insurer in the plural as "we" or "us." According to respondents' brief on appeal, Maryland is Northern's corporate parent, and the two corporations also share personnel. Throughout the litigation, respondents' attorneys acted on behalf of both Maryland and Northern. Indeed, for all intents and purposes the parties have consistently treated Northern and Maryland interchangeably.

[4]The pertinent provisions of the Policy are as follows: "COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

"1. Insuring Agreement.

"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this coverage part applies. We will have the right and duty to defend any 'suit' seeking those damages. We may at our discretion investigate any 'occurrence' or offense and settle any claim or 'suit' that may result. [¶] . . . [¶]

"b. This insurance applies to:

"(1) 'Personal injury' caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

"(2) 'Advertising injury' caused by an offense committed in the course of advertising your goods, products or services;

"but only if the offense was committed in the 'coverage territory' during the policy period.

"2. Exclusions.

of defamatory material whose first publication took place *before* June 4, 1990.

Ringler was one of several other firms named as a defendant in two related lawsuits filed in San Francisco Superior Court: *Weil Insurance Agency, Inc. v. Manufacturers Life Ins. Co.* (Super. Ct. S.F. City and County, 1990, No. 920327) *(Weil)*, and *Legal Economic Evaluations, Inc. v. Metropolitan Life Ins. Co.* (Super. Ct. S.F. City and County, 1990, No. 928624) *(Legal Evaluations)*. The predecessor of the *Legal Evaluations* case, arising out of the same underlying facts, was originally filed in Santa Clara County on April 27, 1989, over a year before the inception of the Policy on June 4, 1990. The *Weil* case was filed on June 7, 1990, just three days after the inception of the Policy; the *Legal Evaluations* lawsuit was subsequently filed in San Francisco Superior Court on February 6, 1991. The cases were vigorously litigated and ultimately decided by the California Supreme Court. (*Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257 [41 Cal.Rptr.2d 220, 895 P.2d 56].)

Both the *Weil* and *Legal Evaluations* actions concerned "certain acts perpetrated . . . in connection with the sale of annuities used to fund 'structured settlements' of personal injury claims." The plaintiffs described themselves as corporations engaged in the business of providing consulting and annuity brokerage services in connection with such annuity-funded structured settlements. The lawsuits targeted life insurers that sold annuities to liability insurers to fund structured settlements, as well as brokers—such as Ringler—that arranged for the sale of annuities and provided consulting services to liability carriers in the negotiation of settlements.

Specifically, the underlying lawsuits alleged that in order artificially to depress the cost of structured settlements, various named defendants, including Ringler, conspired to boycott and injure the plaintiffs through various alleged practices, including the publication and dissemination of false, disparaging, defamatory and derogatory statements about the plaintiffs and their

---

"This insurance does not apply to:

"a. 'Personal injury' or 'advertising injury:' [¶] . . . [¶]

"(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period; [¶] . . . [¶]

"SECTION V—DEFINITIONS

"1. 'Advertising injury' means injury arising out of one or more of the following offenses:

"a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; [¶] . . . [¶]

"10. 'Personal injury' means injury, other than 'bodily injury,' arising out of one or more of the following offenses: [¶] . . . [¶]

"d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; . . ."

services. These alleged defamatory statements included, among other things, that the plaintiffs were unprofessional and conducted their business contrary to lawful industry standards, and injury victims and their attorneys doing business with the plaintiffs would forfeit the available tax exemption applicable to structured settlement proceeds. The *Weil* complaint specifically alleged that beginning "in the early 1980's" the defendants conspired to prohibit brokers from providing "critical information" to victims, to boycott any broker who provided such information or consulting services to injury victims, and to defame and disparage any brokers (allegedly including the plaintiffs) who provided such services to injury victims; all the named defendants had joined the conspiracy "[a]t least by 1986"; and in late 1987 and early 1988, Ringler itself specifically schemed with annuity sellers to disparage the plaintiffs. The *Weil* complaint alleged various specific acts in furtherance of the defendants' conspiracy, occurring on various occasions between May 1985 and June 1988. Identical allegations were made in the *Legal Evaluations* complaint. Notably, both the *Weil* and the *Legal Evaluations* complaints made only broad, generalized allegations that Ringler and the other defendants had made defamations disparaging the respective plaintiffs' businesses in specified ways. Neither complaint actually set out any alleged defamatory statements verbatim or with specificity.

Ringler tendered the defense of the *Weil* action to respondents in June 1990, the same month it was filed. Respondents promptly agreed to contribute pro rata to Ringler's defense, along with Ringler's prior insurers. In April 1991, Ringler tendered the defense of the *Legal Evaluations* action, even though the complaint had not yet been served and Ringler conceded that "[t]here is presently no need for a defense." In December 1991, when respondents' claims adjuster contacted Ringler's counsel, the *Legal Evaluations* action still had not been served. After respondents' claims adjuster told Ringler's attorney that the plaintiffs' counsel in the *Weil* and *Legal Evaluations* cases had stated that there were "several incidents of slander" at issue, Ringler's attorney told the claims adjuster to "stop talking with" the plaintiffs' attorney about the nature and extent of the allegations in the case.

In July 1992, respondents again asked Ringler's counsel for a status report on the *Weil* and *Legal Evaluations* actions "in order to properly evaluate coverage," and specifically inquired whether the *Legal Evaluations* action had yet been served. Respondents also advised Ringler that "[r]eview of the complaint reveal[s] that there are allegations that are not covered under the [P]olicy," and "[a]ny defense of this action will be done . . . under a strict reservation of rights." By letter dated August 31, 1992, respondents sent Ringler's counsel a letter formally reserving respondents' rights with respect

to the *Weil* action, and specifically referencing the first-publication exclusion in the Policy.[5] Neither Ringler nor its counsel objected to or contested this reservation of rights at that time.

As soon as respondents accepted Ringler's tender of defense in the *Weil* and *Legal Evaluations* actions, respondents commenced investigation of the claims made in those two lawsuits. Because *Weil* and *Legal Evaluations* were both filed not long after the inception of the Policy, were both based on allegations of wrongdoing beginning in the early 1980's, and did not allege that any *new* or *different* defamations were first published *after* June 4, 1990, it appeared on the face of the lawsuits that the first-publication exclusion would be applicable to bar coverage of the claims made in both lawsuits. Among other things, respondents sought through their attorneys to ascertain whether there was any evidence outside the *Weil* and *Legal Evaluations* pleadings suggesting the possibility that the *Weil* and *Legal Evaluations* plaintiffs could have amended their complaints to claim that new and different slanders had been committed during the time period covered by the Policy.

By letter dated January 20, 1993, respondents' attorney notified Ringler that respondents' "full reservation of rights" with respect to the *Weil* action applied equally to the *Legal Evaluations* action, stated that respondents' investigation indicated "there may be no duty to further provide a defense nor indemnify" Ringler with respect to either action, specifically cited the first-publication exclusion, and expressly restated respondents' reservation

---

[5]The August 31, 1992, letter stated in pertinent part: "A review of the information to date indicates that there may be no duty to further provide a defense nor indemnify Ringler Associates, et al., in the *[Weil]* action, as the acts and activities complained of appear to have occurred prior to the inception of the policy period and are intentional and/or deliberate in nature. [¶] . . . [¶]

"According to the information that we have received to date, this 'conspiracy' began in the early 1980's with written directives in the form of memorandums and newsletters. Plaintiffs further allege that in retaliation for authoring and co-authoring several articles on structured settlements in 1989, defendants boycotted plaintiff [and] employed . . . intimidation, threats and false disparagement. [¶] . . . [¶]

"As previously stated, although our investigation and discovery performed to date indicates that the acts and activities and the damages therefrom arising from said acts and activities may not have occurred during our policy period, we will continue to provide you with a defense, while proceeding on our investigation under a full Reservation of Rights.

"Those conditions, provisions and exclusions under the [P]olicy not specifically addressed in this letter are hereby preserved in their totality. By this Reservation of Rights on the issues of defense and indemnification, you have the right to independent counsel, the cost of which will be borne by Maryland . . . on a pro rata basis.

"If it is determined through investigation and/or discovery that the acts and activities and damages therefrom did not occur within the policy period, we reserve our right to withdraw from the defense and seek reimbursement for defense fees and costs incurred to date.

"If there is any information that we should be privy to that could change our evaluation of coverage, please submit for our review."

of "the right to withdraw from the defense and seek reimbursement for defense fees and costs incurred to date" in the event "it is determined through investigation and/or discovery that the acts and activities alleged [in the *Weil* and *Legal Evaluations* actions] did not occur within the [P]olicy periods."[6] Once again, neither Ringler nor its attorneys objected to respondents' reservation of rights.

In the course of subsequent discovery, personnel of the *Weil* and *Legal Evaluations* plaintiffs gave deposition testimony that Ringler representatives and employees had made numerous false and disparaging comments about the plaintiff companies, both orally and in writing, between 1985 and 1988. No witness could cite any allegedly derogatory acts or publications that occurred after October 1988, and there was *no evidence* that Ringler representatives had made any defamatory remarks about the plaintiffs in 1989 or thereafter. Based on their review of this evidence from discovery, respondents' attorneys notified Ringler by letter dated June 7, 1993, that respondents had "no further duty to defend or indemnify its insureds" in the underlying *Weil* and *Legal Evaluations* actions, and were "now withdrawing from the defense and from further participation in these actions."

By letter dated June 21, 1993, Ringler's attorney argued that the absence of any concrete evidence of defamatory publications occurring during the

---

[6] In pertinent part, the January 20, 1993, letter stated: "Maryland . . . has been providing Ringler . . . with a defense to the lawsuits described above [*Weil* and *Legal Evaluations*], subject to a full reservation of rights. . . .

"Our review of information to date indicates that there may be no duty to further provide a defense nor indemnify any of the above named insureds in the above referenced actions, as the acts complained of appear to have occurred prior to the inception of Maryland's policies. By specifying this ground for denial of coverage, Maryland does not waive any of the provisions of its policies nor any of the other grounds mentioned in its original reservation of rights letter dated August 31, 1992. By this reference, the terms of that letter are specifically preserved and incorporated herein.

"The second purpose of this letter is to clarify that the same reservation of rights which applies to the [*Weil*] action . . . also applies with equal force to the related [*Weil*] federal case and the [*Legal Evaluations*] state and federal cases . . . .

"Our analysis and investigation to date indicates that the only claims potentially covered by the [Policy] are those arising out of the defamation allegations. In this regard, you should be aware of the following provision contained in [the Policy]: [citing and quoting, among other portions of the Policy, the first-publication exclusion]. [¶] . . . [¶]

"As previously stated, although our investigation and discovery performed to date indicates that the acts and activities complained of may not have occurred during the policy periods, Maryland . . . will continue to provide its insureds with a defense, while proceeding with its investigation under a full reservation of rights. Those conditions, provisions and exclusions under the [Policy] not specifically addressed in this letter are hereby preserved in their totality. *If it is determined through investigation and/or discovery that the acts and activities alleged did not occur within the policy periods, Maryland reserves the right to withdraw from the defense and seek reimbursement for defense fees and costs incurred to date.*" (Italics added, fns. omitted.)

Policy period did not necessarily eliminate the possibility such defamations could have occurred, and might yet be alleged in the *Weil* and *Legal Evaluations* actions. Specifically, Ringler's attorney stated: "The language of the *Weil* and [*Legal Evaluations*] complaints and the discovery conducted thus far in the litigation clearly create the *potential* of liability under the [Policy]"; even though "it is true" the *Weil* plaintiff "went out of business some time in 1989," "the occasion *could have* arisen to have made disparaging remarks about [the *Weil* plaintiff] well into 1990"; "[a]lleged defamatory remarks concerning [the *Legal Evaluations* plaintiff] . . . *could well have been made*" before the filing of the *Legal Evaluations* action in February 1991, and within the coverage period of the Policy; "[t]estimony that defamatory remarks were made 'frequently' 'in the middle '80 years' *hardly precludes the possibility* that other defamatory remarks were made in 1990 and 1991"; and because Ringler denied making any defamatory statements at all, "[i]t is therefore *impossible . . . to ascribe any specific time period* to the alleged defamation, which never took place." (Italics added.)

Respondents' attorney replied to Ringler by letter dated July 28, 1993. After assuring Ringler that respondents neither contended nor assumed that respondents published any defamations at all, he pointed out that for the purposes of determining whether there was any potential for liability under the Policy, it was nevertheless necessary to "indulge[] the fiction . . . that some statements took place. The question presented is when those *allegedly* defamatory statements were first uttered." (Italics added.)[7] Respondents' attorney then reiterated that there was no deposition testimony or any other evidence of any alleged defamatory statements having been made by Ringler or its personnel after 1989; and took the position that "[w]here neither the facts as alleged in the complaint, nor the facts as testified to by either plaintiffs or defendants, reveals a potential for liability under the [P]olicy, an insurer may refuse to defend the complaint." Asserting that "[t]his is precisely the situation presented in these cases," respondents again "respectfully decline[d] to continue to participate in the defense of these cases."

The attorneys for Ringler and respondents continued to exchange correspondence from July 1993 through May 1996, disputing their respective

---

[7]"I want to clear up one misconception upon which your letter appears to be based. We have not assumed that any defamation took place at all. We understand that your clients deny that they defamed [the *Weil* and *Legal Evaluations* plaintiffs]. For you to suggest, however, that because your clients deny that any such defamatory statements took place, that we cannot fix a time when the alleged wrongs took place, is absurd. Were it otherwise, a carrier could never decline coverage on the basis of the date of occurrence or a date of injury, because the client would always deny liability and insist that the wrong had never occurred. Instead, we have proceeded on the assumption that your clients are not guilty of any actionable conduct. We then indulged the fiction, necessary for analytical purposes, that some statements took place. The question presented is when those allegedly defamatory statements were first uttered."

interpretation of deposition testimony from the underlying *Weil* and *Legal Evaluations* lawsuits. Ringler's counsel argued that the first-publication exclusion must be "read narrowly to exclude coverage only for verbatim 'republications,' and not to exclude similar remarks made in different contexts at different times." In support of Ringler's further assertions that "the exclusion is not applicable" because "it cannot presently be ascertained what specific remarks were made and when," and "[t]here is simply no testimony that says definitively that all of the alleged defamation took place prior" to the inception of the Policy, Ringler's attorney cited deposition testimony by personnel of the *Weil* and *Legal Evaluations* plaintiffs to the effect that Ringler's alleged defamations *"all ran together"* so they "couldn't really differentiate" between them, and *"[t]here may have been other acts"* of defamation occurring after 1988, even though they "don't recall any other such acts."

In response, respondents' attorney again pointed out there was no evidence of defamation occurring during the Policy period, and rejected Ringler's assertion that a hypothetical " 'potential' for defamatory remarks" of which there was no actual evidence could create a duty either to defend or to indemnify on the part of the insurers. In subsequent letters, Ringler's attorney continued to argue that because neither the *Weil* nor the *Legal Evaluations* plaintiffs had specified the exact dates of Ringler's allegedly "on-going course of defamation," "the evidence discovered thus far *does not conclusively preclude* the possibility that the plaintiffs will seek to hold Ringler liable for allegedly defamatory remarks made during the [Policy] period," and respondents therefore continued to bear the duty to defend Ringler in the underlying lawsuits. Aside from asserting the abstract possibility that, despite their actual failure to make any such specific allegation, the *Weil* and *Legal Evaluations* plaintiffs theoretically *might* claim Ringler *continued* to slander them after June 4, 1990, Ringler's attorneys never cited *any facts* suggesting that the hypothetical post-1990 defamations *differed* in any way from those alleged to have been made before 1990.

In May 1996, Ringler demanded that respondents participate in a settlement of the underlying litigation in the aggregate amount of $1.65 million. Asserting that "[o]ther insurers have agreed to contribute on behalf of . . . Ringler . . . in varying amounts, but we are short $250,000 in funds in order to complete this settlement," Ringler's attorney demanded that respondents pay that sum toward the settlement. Respondents promptly declined, citing additional evidence elicited in discovery to the effect that all of the underlying plaintiffs' actual or potential claims of defamation occurred outside the Policy period, and moreover constituted continuing defamations arising out of republication of material whose first publication took place before the

beginning of the Policy period on June 4, 1990. As such, respondents contended that coverage was barred by the first-publication exclusion. Ringler ultimately contributed $260,000 to settle the underlying actions.

Ringler filed suit against respondents on December 26, 1996, alleging breach of contract and breach of the covenant of good faith and fair dealing. Both parties filed competing motions for summary judgment. After extensive briefing and oral argument, the trial court determined there was no triable issue of material fact and that respondents were entitled to judgment as a matter of law. The trial court found that the first-publication exclusion "bars any potential coverage for the defamation claims asserted in the underlying [*Weil* and *Legal Evaluations*] actions against Ringler," based on the pleadings, declarations and undisputed evidence establishing that the defamation alleged in the *Weil* and *Legal Evaluations* actions "arose out of oral publication of material whose first publication took place before June 4, 1990," when respondents' Policy began. "Therefore, [respondents] had no duty to defend or indemnify Ringler with respect to the *Weil* and [*Legal Evaluations*] actions, nor [were respondents] required to participate in settlement of the *Weil* and [*Legal Evaluations*] actions, as a matter of law. Because [respondents] had no obligation to defend or indemnify Ringler or to participate in settlement of the underlying *Weil* or [*Legal Evaluations*] actions, [respondents] also cannot be held liable to Ringler on its bad-faith theory, as a matter of law." On this basis, the trial court entered judgment in favor of respondents and against Ringler. This appeal timely followed.

### EXTENT AND APPLICATION OF FIRST-PUBLICATION EXCLUSION

Although both the *Weil* and *Legal Evaluations* complaints made numerous allegations against Ringler of antitrust violations, illegal boycott, discrimination, unfair competition, unjust enrichment, and interference with contract and prospective business advantage, none of these claims are at issue in this case. Only the underlying lawsuits' ancillary claims of defamation potentially fell within the Policy's "personal" or "advertising" injury coverage. Thus, the central and ultimately controlling issue of this case is whether the trial court erred in finding that the first-publication exclusion barred any potential coverage for the defamation claims in the underlying lawsuits against Ringler. The interpretation of the first-publication exclusion in insurance contracts appears to be a question of first impression in California.

The specific Policy language at issue excludes from coverage any "personal" or "advertising" injury "[a]rising out of oral or written publication of *material* whose *first publication* took place *before the beginning of the policy period* . . . ." (Italics added.) Both parties agree that this exclusion is

applicable to certain claims of defamation. They disagree on the limits or scope of the exclusion with respect to particular *kinds* of defamatory claims; specifically, the precise nature or description of the kinds of defamatory statements which would be excluded from coverage because they constitute republications of "material" that was first published before the beginning of the Policy period.

Ringler urges that because the terms "material" and "first publication" are not defined in the Policy, the language of this exclusion is ambiguous and unclear, and must therefore be strictly and "narrowly" construed against the insurers' interest "to exclude coverage only for 'identical republications' of slanderous 'material' (meaning identical or substantially identical oral utterances) by the same person." (Fn. omitted.) Respondents counter that the first-publication exclusion is *not* ambiguous, and that it applies to the content or *substance* of a defamatory publication rather than its *form* or the particular set of words used. Instead of limiting the exclusion to very specific defamatory statements that have been repeated *verbatim* in "identical" words or phrases "by the same person," respondents construe the exclusion as applying more broadly to republication of any identifiably defamatory "material," a term that encompasses any particular defamatory idea, claim, charge, assertion, contention, accusation, or allegation, without regard to whether the defamation is restated in precisely the same words.

Clearly, any useful interpretation of the exclusionary language necessarily turns on the meaning of the word "material." We therefore turn to the question of how this word should be construed in the context of the law of defamation.

### *Applicable Principles of Defamation Law*

Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage. (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645 [85 Cal.Rptr.2d 397]; Civ. Code, §§ 45, 46; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 471, pp. 557-558.) Publication, which may be written or oral, is defined as a communication to some third person who understands both the defamatory meaning of the statement and its application to the person to whom reference is made. Publication need not be to the public or a large group; communication to a single individual is sufficient. (*Cunningham v. Simpson* (1969) 1 Cal.3d 301, 306 [81 Cal.Rptr. 855, 461 P.2d 39]; 5 Witkin, Summary of Cal. Law, *supra,* Torts, §§ 471, 476, pp. 557-558, 560-561.)

Reprinting or recirculating a libelous writing has the same effect as the original publication. (*Schneider v. United Airlines, Inc.* (1989) 208 Cal.App.3d 71, 75 [256 Cal.Rptr. 71]; *McKinney v. County of Santa Clara* (1980) 110 Cal.App.3d 787, 797 [168 Cal.Rptr. 89]; 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 478, pp. 562-563.)[8]

The same is true in the case of slander, or oral defamation; when a person repeats a slanderous charge, even though identifying the source or indicating it is merely a rumor, this constitutes republication and has the same effect as the original publication of the slander. (*Gilman v. McClatchy* (1896) 111 Cal. 606, 612 [44 P. 241]; Rest.2d Torts, §§ 576, 578.) The original slanderer may be liable for the repetition of the slander by a third person, if the slanderer had reason to expect such repetition. (Rest.2d Torts, § 576(c); 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 478, p. 562.)[9]

██ "In all cases of alleged defamation, whether libel or slander, the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose." (*Smith v. Maldonado, supra,* 72 Cal.App.4th at p. 646; *Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572, 581-582 [51 Cal.Rptr.2d 891]; *Schmidt v. Foundation Health* (1995) 35 Cal.App.4th 1702, 1715 [42 Cal.Rptr.2d 172]; *Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 953 [36 Cal.Rptr.2d 360]; *Francis v. Dun & Bradstreet, Inc.* (1992) 3 Cal.App.4th 535, 540 [4 Cal.Rptr.2d 361]; *Gill v. Hughes* (1991) 227 Cal.App.3d 1299, 1309 [278 Cal.Rptr. 306]; *Swaffield v. Universal Ecsco Corp.* (1969) 271 Cal.App.2d 147, 164 [76 Cal.Rptr. 680]; 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 494, p. 583.) It is the defendant's burden to "justify," or show the truth of the statements. (*Lipman v. Brisbane Elementary School Dist.* (1961) 55 Cal.2d 224, 233 [11 Cal.Rptr. 97, 359 P.2d 465].) Significantly, however, the defendant need not justify the literal

---

[8]Libel is statutorily defined as follows: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which cause him [or her] to be shunned or avoided, or which has a tendency to injury him in his [or her] occupation." (Civ. Code, § 45.)

[9]Slander is defined by statute as follows: "Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: [¶] 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime; [¶] 2. Imputes [to] him [or her] the present existence of an infectious, contagious, or loathsome disease; [¶] 3. Tends directly to injure him [or her] in respect to his [or her] office, profession, trade or business, either by imputing to him [or her] general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his [or her] office, profession, trade, or business that has a natural tendency to lessen its profits; [¶] 4. Imputes to him [or her] impotence or a want of chastity; or [¶] 5. Which, by natural consequence, causes actual damage." (Civ. Code, § 46.)

truth of *every word* of the allegedly defamatory matter. It is sufficient if the *substance* of the charge is proven true, irrespective of slight inaccuracy in the details, "so long as the imputation is substantially true so as to justify the 'gist or sting' of the remark." (*Campanelli v. Regents of University of California, supra,* 44 Cal.App.4th at pp. 581-582; see also *Smith v. Maldonado, supra,* 72 Cal.App.4th at pp. 646-647; *Gantry Constr. Co. v. American Pipe & Constr. Co.* (1975) 49 Cal.App.3d 186, 194 [122 Cal.Rptr. 834]; Rest.2d Torts, § 581A, com. f, pp. 236-237; 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 495, pp. 583-584.)

It is an essential element of defamation that the publication be of a false statement of *fact* rather than opinion. (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340 [94 S.Ct. 2997, 3006-3007, 41 L.Ed.2d 789]; *Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600 [131 Cal.Rptr. 641, 552 P.2d 425]; *Campanelli v. Regents of University of California, supra,* 44 Cal.App.4th at p. 578.) Nevertheless, a statement of opinion may be actionable " '. . . if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.' " (*Okun v. Superior Court* (1981) 29 Cal.3d 442, 451-452 [175 Cal.Rptr. 157, 629 P.2d 1369].) Thus, there is no wholesale defamation exemption for anything that might be labeled an opinion. If a statement of opinion implies a knowledge of *facts* which may lead to a defamatory conclusion, the implied facts must themselves be true. Even if the publisher of the opinion states the facts upon which he or she bases this opinion, if those facts are either incorrect or incomplete, or if the person's assessment of them is erroneous, the statement of opinion may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications, and such statements may be actionable. In such a case, the dispositive question is whether a reasonable factfinder could conclude the published statements *imply* an assertion of defamatory *fact*. If so, the defendant must prove the fact is true. (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18-20 [110 S.Ct. 26952705-2707, 111 L.Ed.2d 1]; *Okun v. Superior Court, supra,* 29 Cal.3d at pp. 451-452; *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 837 [52 Cal.Rptr.2d 831]; *Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 724 [275 Cal.Rptr. 494].)

*Construction of the Exclusion Language in Light of Defamation Law*

In light of these broad general principles of defamation, we conclude that as used in the subject exclusion the word "material" means any provably false and defamatory idea, claim, charge, assertion, contention, accusation, or allegation *of fact*, that is stated either orally or in writing. As seen, it is not

the literal truth or falsity of each word or detail used in a statement which determines whether or not it is defamatory; rather, the determinative question is whether the "gist or sting" of the statement is true or false, benign or defamatory, in *substance*. (*Smith v. Maldonado, supra,* 72 Cal.App.4th at pp. 646-647; *Campanelli v. Regents of University of California, supra,* 44 Cal.App.4th at pp. 581-582; *Gantry Constr. Co. v. American Pipe & Constr. Co., supra,* 49 Cal.App.3d at p. 194; Rest.2d Torts, § 581A, com. f, pp. 236-237; 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 495, pp. 583-584.) For this reason, we interpret the language of the Policy exclusion at issue as barring coverage of republication of any identifiably defamatory "material" whenever the first publication *of substantially the same material* occurred before the inception of the policy period, without regard to whether or not the defamatory material is literally restated in precisely the same words.

Thus, we agree with respondents' construction of the first-publication exclusion. Contrary to Ringler's claims, this interpretation would not encompass "virtually any oral disparagement containing some form of commonality." It is not a particularly onerous matter to identify and distinguish one libel or slander from another, based on the *substance* of the disparagement and the nature of the defamatory assertions made. On the other hand, by limiting the scope of the exclusion to verbatim replications of the precise same words and phrases, Ringler's interpretation would effectively render the exclusion meaningless. Particularly in the context of oral slanders, repetitions and republications are rarely, if ever, precisely identical or literally verbatim.[10] Ringler's interpretation is strained and creates an ambiguity where none exists, in violation of the canons of contractual interpretation. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 27 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) It is also contrary to the law of defamation, which does not require that a defamatory *republication*, whether written or oral, be a literal or verbatim duplicate of the original defamatory statement in order to be actionable.

Although the interpretation of the first-publication exclusion has evidently not yet been addressed in any published California decision, respondents'

---

[10]This is particularly so in this case, where the record is undisputed that the *Weil* and *Legal Evaluations* plaintiffs *never specified the actual words of any alleged defamatory remarks,* either in their complaints or in the course of discovery. In light of this unavoidable fact, our adoption of Ringler's argument that the Policy's first-publication exclusion must be construed "to exclude coverage only for 'identical republications' of slanderous 'material' (meaning identical or substantially identical oral utterances) by the same person" would have the effect of rendering that exclusion completely meaningless.

construction of the subject language is generally supported by decisional law from the courts of several other jurisdictions. These authorities are not concerned with the application of first-publication language in a specifically *defamation* context. Nevertheless, they clearly indicate that the first-publication exclusion language at issue is intended to and in fact bars coverage of an insured's continuous or repeated publication of *substantially the same* offending material previously published at a point of time before a policy incepts, while *not* barring coverage of offensive publications made during the policy period which *differ in substance* from those published before commencement of coverage. (*Applied Bolting Technology Products, Inc. v. USF & G* (E.D.Pa. 1996) 942 F.Supp. 1029, 1036-1037 [first-publication exclusion barred coverage of offending advertisement first published before coverage began, notwithstanding claim the advertisement caused a variety of different injuries before and during the coverage period]; *Advance Watch Co., Ltd. v. Kemper Nat. Ins. Co.* (E.D.Mich. 1995) 878 F.Supp. 1034, 1042-1043, revd. as to a different defendant on different grounds (6th Cir. 1996) 99 F.3d 795 [first publication of offending advertising material preceded effective date of insurance; held, first publication exclusion barred coverage of injury from subsequent publications of advertising material on the same product]; *John Deere Ins. Co. v. Shamrock Industries, Inc.* (D.Minn. 1988) 696 F.Supp. 434, 440-441, affd. (8th Cir. 1991) 929 F.2d 413 [first publication of offensive advertising material occurred prior to coverage; exclusion applied to relieve insurer from responsibility to defend or indemnify, even though more wrongful advertising was published after the policy incepted].)

### Application to the Facts of This Case

Having determined the meaning of the word "material" in the Policy's first-publication exclusion, we turn to the question of how this language must be applied under the facts of this case, and specifically whether the trial court was correct in concluding that the exclusion barred any potential coverage for the defamation claims in the underlying lawsuits. Ringler argues the *Weil* and *Legal Evaluations* actions *potentially* included claims that Ringler personnel made "separate and different defamatory or disparaging remarks" about the *Weil* and *Legal Evaluations* plaintiffs at various times up through 1995; and that respondents have "failed conclusively to 'eliminate the possibility' of separate, different defamatory utterances first occurring during its [P]olicy period[;] . . . failed to prove Ringler only republished a prior slander, during [respondents'] [P]olicy period"; and failed to prove there was no *potential* liability on their part for *dissimilar* or *substantially different* defamatory publications about the plaintiffs made by

Ringler after the inception of the Policy period. There are several problems with Ringler's argument.

First, despite Ringler's best efforts to blur the issue, an insurer's duty to defend must be analyzed on the basis of the sources and evidence *actually available to it at the time of the tender of defense.* (*CNA Casualty of California v. Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 605 [222 Cal.Rptr. 276].) In this case, Ringler's own attorneys actually *directed* respondents *not to communicate* with the *Weil* and *Legal Evaluations* plaintiffs' counsel about the number, nature and timing of defamatory statements allegedly made by Ringler personnel. An insured may not speculate about hypothetical, unpled third party claims in order to manufacture coverage, especially where the insured has made it more difficult for the insurer to investigate the claims for which coverage is sought. (*Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629].) Speculation about what additional allegations the *Weil* and *Legal Evaluations* plaintiffs may have made in addition to those set out in their pleadings or revealed through depositions and discovery cannot be used to create a duty to defend or indemnify, where the *actual evidence* supports the application of an exclusion. (*Ibid.*; *Span, Inc. v. Associated Internat. Ins. Co.* (1991) 227 Cal.App.3d 463, 482 [277 Cal.Rptr. 828].)

Second, it is undisputed that the underlying actions alleged an ongoing conspiracy to defame the *Weil* and *Legal Evaluations* plaintiffs, commencing no later than the mid-1980's and continuing into the 1990's. Respondents do not challenge the possibility that separate libels and slanders may have been made after 1990. They simply point out that there is no *positive* evidence any such alleged defamatory publications were actually made after the inception of the Policy; and, more importantly, *there is no evidence whatsoever* any such hypothetical defamations *differed in substance* from the extremely broad and generalized defamations alleged to have been published in the mid-1980's.

Finally, the undisputed evidence in the record demonstrates an exhaustive effort by respondents and Ringler to determine *all* the facts and allegations in the *Weil* and *Legal Evaluations* actions, as pertinent to the first-publication exclusion. Out of this entire undisputed record Ringler cannot point to a single *fact* negating the application of the first-publication exclusion to the defamatory publications alleged in the *Weil* and *Legal Evaluations* actions. To the contrary, the actual record shows that all the alleged defamations occurred *before* the inception of the Policy period, or at most were restatements of the same trade disparagements that had already been repeated for years. Moreover, the record is devoid of any specific alleged defamatory

remarks or statements. Indeed, as Ringler itself has insisted throughout, it is actually impossible to ascertain what specific defamatory remarks were alleged to have been made at *any* time. Quite simply, Ringler cannot manufacture coverage from conjecture about potential claims concerning unspecified, yet hypothetically "different," defamations. (*Hurley Construction Co. v. State Farm Fire & Casualty Co., supra,* 10 Cal.App.4th at p. 538.)[11]

■ In sum, we conclude the trial court was correct both in construing the first-publication exclusion broadly to bar coverage for allegedly defamatory utterances or publications of material whose first publication took place before the inception of the insurance Policy, and in determining that the exclusion applied specifically to bar coverage of the underlying defamation claims in this case. As a result, respondents had no duty to defend or indemnify Ringler with respect to the underlying lawsuits, and were not required to participate in the settlement thereof.

### LIABILITY BASED ON ALLEGED BREACH OF DUTY TO DEFEND

■ The duty to defend is broader than the obligation to indemnify, from which it must be distinguished. The duty to defend exists whenever an insurer ascertains facts which give rise to the *potential* of liability to indemnify. Unlike the obligation to indemnify, which is only determined when the insured's underlying liability is established, the duty to defend must be assessed at the very outset of a case. An insurer may have a duty to defend even when it ultimately has no obligation to indemnify, either because no damages are awarded in the underlying action against the insured, or because the actual judgment is for damages not covered under the policy. (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 659, fn. 9 [42 Cal.Rptr.2d 324, 913 P.2d 878] (*Montrose II*); *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 299-300, 303-304 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose I*); *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081, 1084 [17 Cal.Rptr.2d 210, 846 P.2d 792]; *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 276 [54 Cal.Rptr. 104, 419 P.2d 168]; *City of Laguna Beach v. Mead Reinsurance Corp.* (1990) 226 Cal.App.3d

---

[11]We note that although Ringler's opening brief confidently claims that "[b]oth the *Weil* and [*Legal Evaluations*] complaints alleged acts of defamation or disparagement by different Ringler representatives at different time through at least 1995," in fact not one of the record citations in Ringler's brief lends any support to this statement. The *Weil* and *Legal Evaluations* complaints were themselves filed in June 1990 and February 1991, respectively, and obviously concerned alleged defamations made previously thereto. There is no additional evidence in the record of *any* defamations made after those dates. In our review of the record we have been unable to find a single suggestion in the underlying lawsuits that the *Weil* or *Legal Evaluations* plaintiffs claimed Ringler made any alleged defamatory publications during the Policy period, much less any that differed in substance from those allegedly made prior to the Policy period.

822, 830 [276 Cal.Rptr. 438]; *Saylin v. California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 263 [224 Cal.Rptr. 493]; *CNA Casualty of California v. Seaboard Surety Co., supra,* 176 Cal.App.3d at pp. 605-606.)

Thus, when a suit against an insured alleges a claim that potentially could subject the insured to liability for covered damages, an insurer must defend unless and until the insurer can demonstrate, by reference to undisputed facts, that *the claim cannot be covered.* In order to establish a duty to defend, an insured need only establish the existence of a potential for coverage; while to avoid the duty, the insurer must establish the *absence* of any such potential. (*Montrose I, supra,* 6 Cal.4th at p. 300.)[12] In general, where there is any doubt as to whether the duty to defend exists, the doubt must be resolved in favor of the insured and against the insurer. (*Vann v. Travelers Companies* (1995) 39 Cal.App.4th 1610, 1614-1615 [46 Cal.Rptr.2d 617]; *CNA Casualty of California v. Seaboard Surety Co., supra,* 176 Cal.App.3d at p. 605; *Eichler Homes, Inc. v. Underwriters at Lloyd's, London* (1965) 238 Cal.App.2d 532, 538 [47 Cal.Rptr. 843].)

Ringler now relies on this strong policy to argue that respondents owed it a duty to defend, regardless of whether or not respondents were actually obliged to indemnify Ringler for the claims made in the underlying *Weil* and *Legal Evaluations* lawsuits. From this, Ringler spends considerable energy attempting to bootstrap a claim that because respondents allegedly breached this duty to defend, they are also liable to indemnify Ringler for at least part of the amount it agreed to pay the underlying plaintiffs in settlement. The contention is meritless.

 In the first place, an insurer's duty to defend is not unlimited; it is measured by the nature and kinds of risks actually covered by the terms of the relevant policy. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 19.) Even though an insurer must defend unless and until it can demonstrate that there is no potential for coverage, this rule obviously leaves open the possibility that the insurer *may* reject a tender of defense or withdraw

---

[12]"To prevail, the insured must prove the existence of a *potential for coverage,* while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.* Facts merely tending to show that the claim is not covered, or may not be covered, but [which] are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales. Any seeming disparity in the respective burdens merely reflects the substantive law." (*Montrose I, supra,* 6 Cal.4th at p. 300.) A duty to defend does not exist only when the underlying complaint " '. . . *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*' " (*Ibid.,* quoting *Gray v. Zurich Insurance Co., supra,* 65 Cal.2d at p. 276, fn. 15, italics added by court in *Montrose I.*)

from defending a claim once it is able to demonstrate, by reference to undisputed facts, that the claim *cannot* be covered. (*Montrose I, supra,* 6 Cal.4th at pp. 295-297; *Saylin v. California Ins. Guarantee Assn., supra,* 179 Cal.App.3d at pp. 263-264.)

Under the undisputed record and the terms of the Policy in this case, respondents owed Ringler no duty to defend, even under the broad standards applicable to determining that duty. Neither the *Legal Evaluations* nor the *Weil* complaint alleged defamations published after the inception of the Policy on June 4, 1990, that were different in substance from the defamatory material alleged to have been published throughout the previous decade. Nor did the extensive investigations of both Ringler and respondents uncover any such defamations. Thus, there were no claims of injury, actual *or* potential, that could survive the express terms of the first-publication exclusion in the Policy. There was consequently no duty to defend, and respondents were justified in denying coverage entirely. The defense respondents actually did give to Ringler amounted to a windfall to it and its other insurers.

Moreover, even if we harbored a reasonable doubt that respondents might have had a duty to defend because of some conceivably arguable possibility or *potential* of coverage (*Montrose I, supra,* 6 Cal.4th at p. 300; *Gray v. Zurich Insurance Co., supra,* 65 Cal.2d at p. 276, fn. 15; *CNA Casualty of California v. Seaboard Surety Co., supra,* 176 Cal.App.3d at p. 605), California law would still not permit Ringler to recover damages for breach of the duty to defend. ■ The basic measure of damages for such a breach "is that amount which will compensate the insured for the harm or loss caused by the breach of the duty to defend, i.e., the cost incurred in defense of the underlying suit." (*Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794 [23 Cal.Rptr.2d 73] (*Amato I*).) Exceptions to this rule—as where the insured suffers liability in excess of the policy limits or is defaulted because of inability to defend itself—are inapplicable here. (*Amato v. Mercury Casualty Co.* (1997) 53 Cal.App.4th 825, 834 [61 Cal.Rptr.2d 909] (*Amato II*) [insured was compelled to defend itself, could not do so, and suffered default as a result]; *Finkelstein v. 20th Century Ins. Co.* (1992) 11 Cal.App.4th 926, 928 [14 Cal.Rptr.2d 305] [insured subjected to liability in excess of policy limits].) Ringler suffered no liability in excess of the Policy limits; nor was it compelled or unable to defend itself. Instead, as Ringler implicitly acknowledges, it was fully protected from having to pay *any* costs of its own defense by other insurers who were on the risk when Ringler allegedly first slandered the plaintiffs in *Weil* and *Legal Evaluations.*

Thus, even were we to agree with Ringler's contention that respondents breached a duty to defend, respondents would still not be liable to Ringler

for damages arising from breach of that duty as a matter of law. Ringler was adequately protected by other insurers, and respondents' withdrawal from its defense did not enhance its defense liability or increase the costs it incurred in defense of the underlying lawsuits. (*Johansen v. California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 19 [123 Cal.Rptr. 288, 538 P.2d 744]; *Amato I, supra,* 18 Cal.App.4th at p. 1794.)

WAIVER OF RIGHT TO WITHDRAW FROM DEFENSE OR ASSERT EXCLUSION

Next, Ringler asserts that by agreeing to defend the underlying lawsuits and failing adequately or promptly to reserve their rights, respondent insurers waived any right they may otherwise have had to withdraw from Ringler's defense or dispute their obligation to indemnify its claims. Essentially, Ringler maintains that respondents' payment of Ringler's defense costs for over two years before reserving its rights and then withdrawing from the defense constitutes an "admission" of coverage and a consequent "waiver" of any right either to "unilaterally withdraw" from Ringler's defense, or to contest either the duty to defend or the obligation to indemnify. This contention is completely meritless.

■ Waiver requires the intentional relinquishment of a known right upon knowledge of the facts. The burden is on the party claiming a waiver of right to prove it by clear and convincing evidence that does not leave the matter to speculation. As a general rule, doubtful cases will be decided against the existence of a waiver. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 31; *City of Ukiah v. Fones* (1962) 64 Cal.2d 104, 107-108 [48 Cal.Rptr. 865, 410 P.2d 369]; *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 60 [35 Cal.Rptr.2d 515].) Waiver may be express, based on the words of the waiving party; or implied, based on conduct indicating an intent to relinquish the right. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 31; *Brookview Condominium Owners' Assn. v. Heltzer Enterprises-Brookview* (1990) 218 Cal.App.3d 502, 512-513 [267 Cal.Rptr. 76].)

■ In the insurance context, California courts have applied the general rule that waiver requires the insurer to intentionally relinquish its right to deny coverage, and a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 31; *State Farm Fire & Casualty Co. v. Jioras* (1994) 24 Cal.App.4th 1619, 1627-1628, fn. 7 [29 Cal.Rptr.2d 840] ["Waiver exists when the insurer intentionally relinquishes its right to rely on an exclusion.

[Citation.] Waiver depends solely on the intent of the waiving party, and is not established merely by evidence the insurer failed to specify the exclusion in a letter reserving rights"]; *Velasquez v. Truck Ins. Exchange* (1991) 1 Cal.App.4th 712, 722 [5 Cal.Rptr.2d 1] ["Whether a waiver has occurred depends solely on the intention of the waiving party. [Citation.] An intention to waive a limitations provision is not evinced by the failure to raise that point in a letter denying a claim"].) Thus, an insured's subjective understanding of its insurer's conduct is insufficient to establish waiver, absent some evidence of actual intent. *(Velasquez v. Truck Ins. Exchange, supra,* 1 Cal.App.4th at p. 722.) For this reason, the courts have repeatedly held that an insurer does not waive or relinquish any coverage defenses it fails to assert at the time of its acceptance of a tender of defense, even when it does not make any express and full reservation of rights for a substantial period of time after the defense has been accepted. *(Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at pp. 31-34 [insurer does not automatically waive coverage defenses by failing to raise or assert them from the outset; failure to raise specific defenses for seven years not inconsistent with an intent to enforce the terms of the policy]; *American Motorists Ins. Co. v. Allied-Sysco Food Services, Inc.* (1993) 19 Cal.App.4th 1342, 1350 [24 Cal.Rptr.2d 106], overruled on other grounds in *Buss v. Superior Court* (1997) 16 Cal.4th 35, 50 [65 Cal.Rptr.2d 366, 939 P.2d 766] [insurer did not waive coverage defense despite nine-month delay in sending reservation-of-rights letter after acceptance of defense]; *National Union Fire Ins. Co. v. Siliconix Inc.* (N.D.Cal. 1989) 726 F.Supp. 264, 270 [insurer did not waive coverage defense despite 15-month delay in reserving its rights after accepting tender of defense].)

Thus, it is insufficient for Ringler to rely on the fact respondents participated in its defense for approximately two years before formally reserving their rights to assert defenses to coverage. The statement of the court in *State Farm Fire & Casualty Co. v. Jioras* is applicable here: "Under appellants' view, if the insurer did not reserve its rights the insured would *automatically* receive coverage without showing either reliance (for estoppel) or intentional relinquishment (for waiver). [This] is not the law in California." (24 Cal.App.4th at p. 1628, fn. 8.) In short, there is no evidence respondents ever made any *intentional* relinquishment of their coverage defenses at any point, despite initially accepting Ringler's tender of defense and funding that defense for two years. There is therefore no evidentiary basis for any claim of waiver in this case. *(Id.* at pp. 1627-1628 & fns. 7, 8.) Rather than a waiver of its rights to assert the first-publication exclusion,

respondents' defense of the underlying lawsuits actually constituted a wind-fall to Ringler.[13]

The only possible remaining theory on which Ringler could base coverage would be estoppel. However, under the facts of this case, that theory is similarly unavailable to Ringler. There is no evidence to support either (1) a reasonable belief on Ringler's part that respondents would provide coverage, or (2) a finding of any detrimental reliance by Ringler on respondents' conduct. *Both* of these findings would be essential to a claim of estoppel. (*State Farm Fire & Casualty Co. v. Jioras, supra,* 24 Cal.App.4th at pp. 1627-1628, & fns. 7, 8.)

Crucially, there is absolutely nothing in the record to suggest Ringler detrimentally relied on respondents' failure to make a formal reservation of rights between the time of respondents' initial acceptance of the tender of the defense of the *Weil* action in June 1990 and their explicit reservation of rights under the first-publication exclusion, as set out in the letters from respondents' attorneys to Ringler written in July and August 1992. Significantly, neither Ringler nor its counsel objected to or contested respondents' formal reservation of rights at that time. Respondents did not actually withdraw from the defense of the *Weil* and *Legal Evaluations* actions until June 1993, *one year later.* Ringler did not even settle the underlying lawsuits for another three years, in May 1996. During that lengthy period of time, Ringler was fully aware and on notice of respondents' claim that that they had no obligation to defend or indemnify Ringler, and the latter had ample opportunity to contest respondents' reservation of rights by a declaratory relief action or other means. It failed to do so. Clearly, there are no grounds for an estoppel claim in this case. (*State Farm Fire & Casualty Co. v. Jioras, supra,* 24 Cal.App.4th at pp. 1627-1628, & fns. 7, 8; *cf. Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810, 1838-1839 [54

---

[13]Ringler also makes the somewhat contrived argument that Northern—as distinct from Maryland—"never issued a reservation of rights letter," and should thus be conclusively "deemed" to have waived any denial of coverage or the duty to defend. This contention borders on the frivolous.

As noted, the record shows the parties consistently treated Maryland and Northern interchangeably, and as for all intents and purposes the same insurer under the Policy. Although Ringler now insists all of its communications during respondents' defense of the underlying lawsuits were with Maryland and Northern never issue a reservation-of-rights letter, Ringler admitted in its statement of undisputed material facts at trial that all of its communications concerning coverage were with *Northern.* These admissions are binding on Ringler on appeal. (*Strasberg v. Odyssey Group, Inc.* (1996) 51 Cal.App.4th 906, 920 [59 Cal.Rptr.2d 474].)

Cal.Rptr.2d 176] [record showed insured detrimentally relied on insurer's nonassertion of a reservation of rights].)[14]

### LEGITIMACY OF UNILATERAL WITHDRAWAL FROM DEFENSE

Finally, Ringler argues that even if the Policy's first-publication exclusion *did* bar coverage of the defamation claims made in the underlying *Weil* and *Legal Evaluations* actions, and even if respondents did *not* waive their right to withdraw from Ringler's defense by accepting the tender of defense and failing to issue a contemporaneous reservation of rights, respondents were still barred from unilaterally withdrawing from Ringler's defense because they did not follow the "proper procedures" for doing so. According to Ringler, notwithstanding the substantive legitimacy of respondents' position that, under the Policy exclusion, Ringler was entitled neither to indemnification nor to a defense, Ringler *is* nevertheless entitled to *both* indemnification and bad-faith damages because respondents failed to obtain a declaratory judgment prior to withdrawing from their pro rata participation in Ringler's insurer-provided defense fund. Once again, Ringler's contention is meritless.

---

[14]Both in its briefs and in oral argument, Ringler has contended only that respondents "waived" any right they had to withdraw from the defense or assert the first-publication exclusion, and has eschewed any argument based on estoppel. Close examination of Ringler's reasoning, however, reveals that its so-called waiver argument is actually an estoppel claim in all but name. Thus, in oral argument, Ringler's appellate counsel argued that if respondents had formally reserved their rights earlier than they did, Ringler could have brought a declaratory relief action and initiated discovery to litigate and investigate respondents' claim that coverage was barred by the first-publication exclusion. On the basis of this apparent claim of detrimental reliance, Ringler asked this court to determine as a matter of law when waiver may be established by the conduct of the party which has assertedly waived its rights.

As seen, Ringler's arguments are contradicted by the facts on the record. In the first place, even though respondents did not formally notify Ringler of their reservation of rights until August 1992, two years after initially accepting Ringler's tender of the defense of the *Weil* action, respondents did not actually withdraw from the defense for one more year, until June 1993, and the underlying litigation did not settle until May 1996, yet another *three years later.* This chronology of facts demonstrates beyond the shadow of a doubt that Ringler had more than ample time in which to bring a declaratory relief action and undertake intensive discovery to resolve any issues raised by respondents' reservation of rights and withdrawal of its defense under the first-publication exclusion.

Nor are Ringler's arguments sound from the standpoint of the law. Indeed, they manifest a profound misunderstanding of the concept of waiver, which requires an *intentional* relinquishment of a known right *upon knowledge of the facts.* Ringler's request that we find waiver established by the allegedly prejudicial effect of the conduct of the party alleged to have waived its rights, without regard to that party's actual intention, confuses waiver with estoppel. (*State Farm Fire & Casualty Co. v. Jioras, supra,* 24 Cal.App.4th at pp. 1627-1628, & fns. 7, 8.) In any event, the burden for establishing waiver is on the party claiming the existence of a waiver—in this case, Ringler itself—*not* the party alleged to have waived a right. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 31.)

Contrary to Ringler's contention, there is no particular requirement that an insurer ask the permission of a trial court before withdrawing from a defense, once the insurer has determined that no potential for indemnification liability exists. Although—in order to avoid any possibility of liability for bad faith—it may be *prudent* for an insurer to obtain a declaratory judgment that it has no defense duty before unilaterally withdrawing from a defense, it is not required to do so. (*Montrose I, supra,* 6 Cal.4th at pp. 301-304; *Tamrac, Inc. v. California Ins. Guarantee Assn.* (1998) 63 Cal.App.4th 751, 757-758 [74 Cal.Rptr.2d 338]; *Travelers Indem. of Ill. v. Ins. Co. of N. America* (S.D.Cal. 1995) 886 F.Supp. 1520, 1526.) The cases cited by Ringler stand for the proposition that where a duty to defend appears on the face of a complaint, it may only be terminated *prospectively,* and not *retrospectively.* (*Buss v. Superior Court, supra,* 16 Cal.4th at p. 46; *Fireman's Fund Ins. Co. v. Chasson* (1962) 207 Cal.App.2d 801, 807 [24 Cal.Rptr. 726]; *Travelers Indem. of Ill. v. Ins. Co. of N. America, supra,* 886 F.Supp. at p. 1526.) Ringler appears to confuse this principle—which was clearly not violated in this case—with an imagined duty to obtain a declaratory judgment in all cases before withdrawing a defense. No such obligation exists.

Here, as the trial court determined, there never was a duty to defend. The fact respondents initially accepted Ringler's tender of defense and then continued to contribute to Ringler's defense costs while at the same time investigating whether coverage actually existed does not mean there ever was a potential for coverage under the factual circumstances of the case. Although it took time for discovery to reveal that there were in fact *no* claims made in this case that were not barred from coverage by the first-publication exclusion, this passage of time did not lock respondents into continuing to defend Ringler once that discovery was completed. In the final analysis, investigation of the claims made in the *Weil* and *Legal Evaluations* actions through this discovery process revealed that there *never was* a potential for coverage and, hence, never a duty to defend from the outset. (*Tamrac, Inc. v. California Ins. Guarantee Assn., supra,* 63 Cal.App.4th at pp. 757-758.)

In short, contrary to Ringler's arguments, an insurer which mistakenly accepts a tender of defense is not subsequently required to obtain a declaratory judgment before it can withdraw, on pain of suffering liability for defense and settlement expenses not actually covered under the terms of its insurance policy. Because it could cost as much for an insurer to prosecute a declaratory relief action on the question of coverage as to pursue the underlying litigation to completion, adoption of such a rule would as a practical matter lock virtually all liability insurers into a duty to defend regardless of the actual terms of their policies. The law does not require this.

## DISPOSITION

The judgment is affirmed.

Parrilli, J., and Walker, J., concurred.

A petition for a rehearing was denied June 22, 2000.