**LEXINGTON INSURANCE COMPANY, National Union Fire Insurance Company of Pittsburgh, PA, American International Underwriters Insurance Company and Chartis Specialty Insurance Company, Plaintiffs,**

v.

**MGA ENTERTAINMENT, INC., Defendant.**

**MGA Entertainment, Inc., Counterclaimant,**

v.

**Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, American International Underwriters Insurance Company, Chartis Specialty Insurance Company, and Crum & Forster Specialty Insurance Company, Counterdefendants.**

No. 12 Civ. 3677(SAS).

United States District Court, S.D. New York.

July 10, 2013.

Opinion Denying Reconsideration Aug. 8, 2013.

Mark D. Sheridan, Esq., Mark C. Errico, Esq., Patton Boggs LLP, Newark, NJ, for Plaintiffs and Counterdefendants Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, American International Underwriters Insurance Company, and Chartis Specialty Insurance Company.

Michael J. Bidart, Esq., Ricardo Echeverria, Esq., Shernoff Bidart Echeverria Bentley LLP, CA, for Defendant and Counterclaimant MGA Entertainment, Inc.

Susan J. Field, Esq., Musick, Peeler & Garrett LLP, CA, for Counterdefendant Crum & Forster Specialty Insurance Company.

### OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge:

## I. INTRODUCTION

Lexington Insurance Company ("Lexington"), National Union Fire Insurance

Company of Pittsburgh, PA ("National Union"), American International Underwriters Insurance Company ("AIU"), and Chartis Specialty Insurance Company ("Chartis") (collectively, "Plaintiffs") bring this action seeking a declaration that they were not obliged to defend or indemnify MGA Entertainment, Inc. ("MGA") in connection with an action brought against MGA in this Court,[1] *Bernard Belair v. MGA Entertainment, Inc.* ("Underlying Action").[2] The present action was brought in the Central District of California and transferred to this Court on May 9, 2012 pursuant to 28 U.S.C. § 1404.[3] MGA now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) on the issue of duty to defend against National Union and Chartis ("the Umbrella Insurers"), and against counterdefendant Crum & Forster Specialty Insurance Company ("C & F") (together with the Umbrella Insurers, "the Insurers"). The Umbrella Insurers and C & F cross-move[4] on the duty to defend issue and on MGA's

counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing. Lexington joins in the Umbrella Insurers' cross-motion.[5] For the following reasons, MGA's motion as to the Umbrella Insurers is granted in part and denied in part, and its motion as to C & F is denied. The Umbrella Insurers' cross-motion is granted in part and denied in part, while Lexington's cross-motion is granted. C & F's cross-motion is granted.

## II. BACKGROUND [6]

### A. The Insurance Policies

Plaintiffs issued primary commercial general liability insurance and commercial "umbrella" liability insurance policies to MGA for the years 1999 through 2007.[7] Counterdefendant C & F issued a general liability policy for the years 2003, 2004, and 2005.[8] At issue on these motions are the policies issued by National Union and Chartis for the years 2001 and 2002, re-

---

1. *See* Complaint ("Compl.") ¶ 8.

2. 831 F.Supp.2d 687 (S.D.N.Y.2011). This Court granted summary judgment to MGA in an action for copyright infringement brought by Bernard Belair, finding that only Belair's particular and original expression of "an absurdly large-headed, long limbed, attractive, fashionable woman" with heavy makeup was protectible, since generally "exaggerated and idealized proportions are (distressingly) commonplace in both children's toys and the fashion industry." *Id.* at 698, 694. Accordingly, this Court found that Belair's images were not substantially similar to the Bratz line of absurdly-proportioned and heavily madeup dolls. *See id.* at 696.

3. *See* Dkts. 73–74; *infra* Part IV.A.

4. C & F also moves, in the alternative, for partial summary judgment based on a number of narrower grounds. *See* C & F's Notice of Cross–Motion for Summary Judgement or Partial Summary Judgment at 2–3.

5. *See* Lexington's Notice of Joinder and Joinder in Cross–Motion for Summary Judgment, Dkt. 127.

6. The parties do not genuinely dispute the following facts. While the Umbrella Insurers equivocate by responding to many of MGA's undisputed facts with "[d]isputed to the extent that the purported undisputed fact differs from, mischaracterizes, or is inconsistent with the" complaint in the Underlying Action or the Policies, in many instances no specific dispute is actually provided. Umbrella Insurers' Response to Statement of Undisputed Facts Filed by MGA ¶¶ 3; 23. This Court will consider all facts responded to in this manner as undisputed.

7. *See* Insurance Policies from 1999 through 2007, Compl. Exs. 1–11.

8. *See* C & F Primary General Liability Policies ("C & F Policies"), Ex. 11 to 4/8/13 Request for Judicial Notice submitted by MGA ("MGA RJN").

spectively, and the policy issued by C & F for the year 2003 (together, "Policies").[9]

MGA suggested in its opening brief as to C & F that MGA sought summary judgment regarding the duty to defend with respect to policies issued by C & F in 2004 and 2005.[10] However, MGA now concedes that a multi-media exclusion contained in the C & F policies for 2004 and 2005 "excluded liability arising out of the publication of an advertisement" for those years.[11] As such, C & F had no duty to defend for the years 2004 and 2005.

■ Lexington issued general liability policies to MGA for the years 2006 and 2007 ("Lexington Policies"), but MGA does not move for summary judgment on the duty to defend under those policies.[12] This is likely because the Lexington Policies contain an exclusion barring coverage for advertising injury "committed or alleged to have been committed in any advertising ... in the conduct of the insured's advertising ... or other publishing activities," ("advertising exclusion").[13] Because the crux of MGA's argument is that the Complaint filed in the Underlying Action made allegations "sufficient to suggest a claim that MGA's advertising ... infringed Be-

lair's copyrights,"[14] the Lexington Policies' advertising exclusion necessarily negates coverage with respect to the Underlying Action. Accordingly, Lexington had no duty to defend in the Underlying Action and its cross-motion is granted.

National Union issued a commercial umbrella policy to MGA providing coverage from January 1, 2001 through January 1, 2002 ("2001 Policy").[15] Chartis issued a similar policy covering January 1, 2002 through January 1, 2003 ("2002 Policy") (together with the 2001 Policy, "Umbrella Policies").[16] The Umbrella Policies provide coverage and a defense against liability that is not covered under MGA's commercial liability insurance, but is covered by the Umbrella Policies.[17] The Umbrella Policies impose a duty to defend MGA against "any claim or suit seeking damages" for an "Advertising Injury."[18] This duty is limited, however, in several ways. *First,* the Umbrella Policies provide for coverage in suits alleging an injury "arising solely out of [the insured's] Advertisement"[19] as a result of, in relevant part, "infringement upon another's copyright, trademark, or slogan in [the insured's] Advertisement."[20] "Advertisement" is de-

---

9. *See* MGA's Memorandum in Support of Motion for Summary Judgment Against National Union and Chartis ("MGA Umbrella Insurers Mem.") at 3. *See also* MGA's Memorandum in Support of Motion for Summary Judgment Against C & F ("MGA C & F Mem.") at 3.

10. *See* MGA C & F Mem. at 3.

11. MGA's Statement of Genuine Issues in Opposition to C & F's Cross–Motion for Summary Judgment ("MGA Statement") at 18.

12. *See* Supplemental Declaration of Mark Sheridan, counsel to Lexington ("Supp. Sheridan Decl."), Exs. O–P.

13. *Id.*

14. MGA Umbrella Insurers Mem. at 2.

15. *See* National Union Policy for 2001 ("2001 Policy"), Ex. 5 to Compl.

16. *See* Chartis Policy for 2002 ("2002 Policy"), Ex. 6 to Compl. Since they are virtually identical, the two Umbrella Policies are described and referred to together unless a distinction is necessary.

17. *See* MGA Umbrella Insurers Mem. at 3. *See also* 2001 Policy at 183; 2002 Policy at 228.

18. 2001 Policy at 183.

19. The 2002 Policy refers to "advertising activities" rather than the insured's "Advertisement." 2002 Policy at 230.

20. 2001 Policy at 185.

fined as "a paid broadcast, publication or telecast to the general public or specific market segments about [the insured's] goods, products or services for the purpose of attracting customers or supporters." [21] To qualify for coverage under the Umbrella Policies, the Advertising Injury alleged in the suit must be one that "takes place during the Policy Period." [22] *Second*, the Umbrella Policies do not apply to "[a]dvertising injury: ... arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the Policy Period," ("prior publication exclusion").[23]

C & F issued a commercial general liability policy to MGA covering the year 2003 ("C & F Policy"), which offered coverage similar to that provided by the Umbrella Policies.[24] The only meaningful distinction between the C & F Policy and the Umbrella Policies is that the C & F Policy provides coverage in suits alleging an injury "arising out of" the insured's infringement of another's copyright in the insured's advertisement,[25] *i.e.*, it does not contain the "arising solely out of" lan-

guage.[26] Like the Umbrella Policies, the C & F Policy limits coverage to suits arising out of an alleged offense that occurred during the policy period, and contains a prior publication exclusion.[27]

## B. The Underlying Complaint

Bernard Belair filed the Underlying Action in October 2009, asserting, in relevant part, a cause of action for copyright infringement against MGA.[28] Belair, an artist and photographer, created a series of images ("Belair Images") to be used in advertisements for Steve Madden shoes in the late 1990's.[29] The Underlying Complaint alleges that the Belair Images—for which Belair received sixteen Certificates of Registration from the U.S. Copyright Office—have "large heads, large oval eyes, small bodies and large feet." [30] Belair alleges further that Carter Bryant, a then-employee of MGA, testified in *Mattel, Inc. v. MGA Entertainment, Inc.*[31] that he created a series of sketches ("Bryant Sketches") inspired by Belair's Steve Madden advertisements, which sketches formed the basis for the Bratz line of toys

---

**21.** *Id.*

**22.** *Id.* at 182.

**23.** *Id.* at 196.

**24.** *See* C & F Policy, Ex. A to Declaration of Eric Tibak, counsel to C & F ("Tibak Decl.").

**25.** *Id.* at 10.

**26.** 2001 Policy at 185. The C & F Policy also defines "advertisement" slightly differently, as "a notice that is broadcast or published to the general public or specific market segments about [the insured's] goods, products or services for the purpose of attracting customers or supporters." C & F Policy at 9.

**27.** *See* C & F Policy at 8. The C & F Policy's prior publication exclusion is almost identical to that of the Umbrella Policies; it bars coverage for advertising injury "arising out of oral

or written publication of material whose first publication took place before the beginning of the policy period." *Id.* As such, no distinction will be made between the Policies' prior publication exclusions.

**28.** *See* Complaint in *Belair v. MGA Entm't, Inc.*, No. 09 Civ. 8870, Ex. A to Declaration of Mark Sheridan, counsel to the Umbrella Insurers ("Sheridan Decl."). The Second Amended Complaint in the Underlying Action ("Underlying Complaint") will be referenced herein since it is the most current. *See* Ex. C to Sheridan Decl.

**29.** *See* Underlying Complaint ¶ 3.

**30.** *Id.* ¶¶ 9–11.

**31.** No. CV 05–2727 (C.D.Cal. filed April 13, 2005).

and dolls.[32] The Underlying Complaint alleges that the Bryant Sketches, the sculpts made from those sketches, and the Bratz dolls are all "substantially similar" to the Belair Images.[33] However, no specific allegations are made regarding which sketches, sculpts, or dolls are substantially similar to which of Belair's sixteen copyrighted images.[34] Rather, the Underlying Complaint alleges broadly that "[t]he [Bryant Sketches] and sculpts, and Bratz dolls, are substantially similar to the Belair Images" since the Bryant Sketches and Bratz dolls—when compared to the Belair Images—contain several "nearly identical features," have similar "character, fashion styling and posture;" have "significant resemblances in their overall proportions;" and have substantially similar "clothing and accessories that portray a young, fashionable look."[35]

On the basis of this purported substantial similarity, the Underlying Complaint alleges that MGA infringed Belair's copyrighted images (1) "by copying the Belair Images to create the Bratz line of dolls, toys, games and videos based on the Belair Images;" (2) "by creating derivative works of the Belair Images in the Bratz line of dolls, toys, games and videos;" and (3) "by distributing and selling the Bratz line of dolls, toys, games and videos."[36] The allegations are temporally vague; the Underlying Complaint declares that "MGA has infringed and will continue to infringe" the sixteen copyrighted images.[37] The Underlying Complaint designates as infringing items the following: (1) Bratz dolls; (2) Bratz toys; (3) Bratz games; (4) Bratz videos; (5) Bratz packaging; and (6) Bratz "marketing materials."[38] That is, the Underlying Complaint alleges copyright infringement based on the entire Bratz line of products. The Underlying Complaint seeks, among other relief, to permanently enjoin MGA from "manufacturing, producing, publishing, displaying, [or] distributing ... any work that infringes" on the Belair Images, and to recover damages pursuant to the alleged infringement.[39]

## C. The Refusal to Defend

MGA tendered the Complaint in the Underlying Action to the Umbrella Insurers and C & F on October 27, 2009.[40] C & F denied coverage on December 30, 2009,[41] and the Umbrella Insurers denied coverage on March 26, 2010.[42] MGA tendered the Second Amended Complaint (i.e., the Underlying Complaint) to C & F in October 2010, and C & F denied coverage again in January 2011.[43]

32. See Underlying Complaint ¶¶ 13–14. The Underlying Complaint alleges that "sculpts" or "sculpt drawings" were made based on the Bryant Sketches, and that those sculpts became molds for the Bratz dolls. See id. ¶ 13.

33. Id. ¶ 22.

34. See id. ¶¶ 22–23.

35. Id.

36. Id. ¶ 34.

37. Id.

38. Id. ¶ 28.

39. Id. at 9.

40. See 10/27/09 Letters from MGA to National Union, Chartis, and C & F, Exs. 7–8 to Declaration of Michelle Darringer, counsel to MGA ("Darringer Decl.").

41. See 12/30/09 Letter from C & F to MGA ("C & F Letter"), Ex. 10 to Declaration of Michael Bidart, counsel to MGA ("Bidart Decl.").

42. See 3/26/10 Letters from National Union and Chartis to MGA ("National Union Letter" and "Chartis Letter," respectively), Exs. M–N to Sheridan Decl.

43. See MGA Statement at 9. See also 1/13/11 Letter from C & F to MGA, Ex. M to Declaration of Jennifer Kokes, counsel to C & F ("Kokes Decl.").

In denying coverage, the Umbrella Insurers made two basic arguments: (1) that the Underlying Action did not assert a claim for damages arising out of an Advertising Injury as defined in the 2001 and 2002 Policies, and (2) that, even if such a claim was asserted, the prior publication exclusion barred coverage under the policies because the first Bratz prototypes were exhibited in November 2000.[44] The Umbrella Insurers maintained that the "undisputed facts developed in the Bryant Action[45] establish that the first publication of the allegedly infringing Carter Bryant sketches took place in 2000."[46] C & F made the same arguments, but asserted that the prior publication exclusion applies because the Bryant Sketches were first published in 2001, not 2000.[47] Moreover, C & F concluded that the "material" published prior to the policy period—*i.e.*, the dolls or sketches published in 2000 or 2001—was "substantially similar" to any other allegedly infringing work published during the policy period, such that the prior publication exclusion would preclude coverage completely as to the Underlying Action.[48]

## D. Extrinsic Evidence Regarding First Date of Publication

In their letters denying coverage in the Underlying Action—and their motions here—the Insurers reference extrinsic evidence to support their arguments that the first allegedly infringing Bratz sketches or dolls were published in 2000 or, alternatively, 2001.[49] The Umbrella Insurers rely on the testimony of MGA CEO Isaac Larian ("Larian") that the "first exhibition" of "just the [Bratz] drawings" (*i.e.*, the Bryant Sketches) was in November 2000 when the drawings were "presented to retailers."[50] Larian also testified that "[the Bryant Sketches] were further exhibited in Hong Kong in January 2001,"[51] and that "[t]he Bratz dolls were first publicly made available for sale at the retail level in August 2001 in the USA."[52] The Umbrella Insurers also reference a December 2000

---

**44.** *See* Chartis Letter at 2–4; National Union Letter at 2–4.

**45.** The "Bryant Action" refers to *Bryant v. Mattel, Inc.*, No. CV 04–9049 (C.D. Cal. filed November 2, 2004). The Bryant Action was consolidated with *Mattel Inc. v. MGA Entertainment, Inc.*, No. CV 05–2727 (C.D.Cal. filed April 13, 2005). The consolidated action will be referred to herein as the *Mattel* Action.

**46.** National Union Letter at 2; Chartis Letter at 2.

**47.** *See* C & F Letter at 13.

**48.** *See id.* at 14.

**49.** *See* National Union Letter; Chartis Letter; C & F Letter; Sheridan Decl. Exs. D–H, L; Kokes Decl. Exs. C–L. Much of this evidence was offered in the *Mattel* Action. *See, e.g.,* Kokes Decl. Exs. C–L.

**50.** Testimony of Isaac Larian ("Larian Testimony"), Ex. E to Sheridan Decl., at 1797:19–

25. The Umbrella Insurers also reference the testimony of a then-MGA employee, Margaret Leahy, who testified to having a meeting in October 2000 with a vendor discussing, apparently, the possibility of making a silicon mold based on the Bryant Sketches. *See* Testimony of Margaret Leahy ("Leahy Testimony"), Ex. H to Sheridan Decl., at 4154–4156. The Umbrella Insurers reference this testimony as being contained in Exhibit F to the Sheridan Declaration. *See* Brief in Opposition to MGA's Motion for Partial Summary Judgment Against National Union and Chartis ("Umbrella Insurers' Mem.") at 18. It is, in fact, contained in Exhibit H. *See* Leahy Testimony. Carter Bryant testified that he met with Leahy around October 2000 so that Leahy "could have an idea of what to sculpt." Testimony of Carter Bryant ("Bryant Testimony"), Ex. K to Kokes Decl., at 2563:14–16.

**51.** Affidavit of Isaac Larian ("Larian Aff."), Ex. D to Sheridan Decl., ¶ 13.

**52.** *Id.*

email to a Walmart buying agent which included several of the Bryant Sketches as attachments.[53] The Umbrella Insurers do not cite the text of the email, which reads: "Please see attached pictures & photos for the fashion dolls that we are going to present to Ron in Jan. In fact, this series of dolls is one of our key items for 2001. [¶] Please note that those pictures are *preliminary* concept drawings and are for your *reference only.* The final products may vary when we put these in production. However, we will have mockups/working samples available in Jan [2001] Toy Show." [54]

C & F relies on a variety of evidence in support of its argument [55] that the date of first publication of the allegedly infringing Bratz products is no later than 2001. *First,* Certificates of Registration from the United States Copyright Office for many of the Bryant Sketches include a first publication date of February 12, 2001.[56] *Second,* testimony of the then-managing director of MGA Hong Kong establishes that Bryant and MGA entered into an agreement to design and develop the Bratz line in 2000, and that "17 initial concept and design drawings of the [Bratz] dolls," *i.e.,* the Carter Bryant sketches, were made by

Bryant in 2000.[57] Many of those sketches contain a handwritten "contract date" of September 2000.[58] *Third,* the 2000 Email (also referenced by the Umbrella Insurers) establishes that the *"preliminary* concept drawings" would be converted into samples and presented at a January 2001 toy show.[59]

## III. LEGAL STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if the moving party shows "that there is no genuine dispute as to any material fact and [that the party is] entitled to judgment as a matter of law." [60] "A genuine dispute exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit." [61]

The movants "bear[ ] the burden of establishing the absence of any genuine issue of material fact." [62] To defeat the movants' motions, the party opposing the motion "must show more than 'some metaphysical doubt as to the material facts,'" [63] and "may not rely on conclusory allegations or unsubstantiated speculation." [64]

53. *See* National Union Letter at 2; Chartis Letter at 2;

54. 12/14/00 Email from Eric Yip to Eling Poon ("2000 Email"), Ex. J. to Kokes Decl., at 97 (emphasis in original).

55. *See* C & F's Memorandum in Opposition to MGA's Motion for Summary Judgment ("C & F Mem.") at 20. C & F argues, more precisely, that MGA first began "distributing and selling" the Bratz line in 2001. *See id.*

56. *See* Kokes Decl. Ex. C at 27; Ex. D at 34; Ex. E at 50.

57. Affirmation of Lee Shiu Cheung ("Cheung Aff."), Ex. F to Kokes Decl., at ¶¶ 5–7.

58. Ex. G to Kokes Decl., at 70–84.

59. 2000 Email at 97.

60. Fed.R.Civ.P. 56(a).

61. *Finn v. N.Y. State Office of Mental Health–Rockland Psychiatric Ctr.,* 489 Fed.Appx. 513, 514 (2d Cir.2012) (quotations omitted).

62. *Zalaski v. City of Bridgeport Police Dep't,* 613 F.3d 336, 340 (2d Cir.2010).

63. *Gioia v. Forbes Media LLC,* 501 Fed.Appx. 52, 54 (2d Cir.2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

64. *Robinson v. Allstate Ins. Co.,* 508 Fed. Appx. 7, 9 (2d Cir.2013) (quotations omitted).

In deciding these motions, I must "construe the facts in the light most favorable to the non-moving party," that is, to Plaintiffs and C & F with respect to MGA's motion and to MGA with respect to Plaintiffs' and C & F's motions, "and must resolve all ambiguities and draw all reasonable inferences against the movant[s]," that is, against MGA with respect to its motion, and against Plaintiffs and C & F with respect to their motions.[65] However, " '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' "[66] "[T]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[67]

■ The summary judgment standard regarding the duty to defend is unique in that—rather than precluding summary judgment—"any factual dispute affecting the existence of [insurance] coverage creates a potential for coverage and a duty to defend."[68] "Once a prima facie showing is made that the underlying action fell within coverage provisions, an insurer may defeat a motion for summary judgment [on the duty to defend] only by producing undisputed extrinsic evidence conclusively eliminating the potential for coverage under the

policy."[69] "Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages ... will fall within the scope of coverage, therefore add no weight to the scales. Any seeming disparity in the respective burdens merely reflects the substantive law."[70]

## IV. APPLICABLE LAW

### A. California State Law Applies

■ "A district court sitting in diversity applies the law of the forum state."[71] When a case has been transferred under 28 U.S.C. § 1404, the "forum state" is the state where the action was originally filed, i.e., California.[72] "[T]he transferee district court must be obligated to apply the state law that would have been applied if there had been no change in venue."[73]

### B. Insurance Contract Interpretation

■ Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. [Citation.] The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual

**65.** *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir.2013) (quotations omitted).

**66.** *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir.2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)) (emphasis removed).

**67.** *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir.2012) (quotations omitted).

**68.** *State Farm General Ins. Co. v. Mintarsih*, 175 Cal.App.4th 274, 284 n. 6, 95 Cal.Rptr.3d 845 (2009).

**69.** *Anthem Elec., Inc. v. Pacific Emp'rs Ins. Co.*, 302 F.3d 1049, 1060 (9th Cir.2002).

**70.** *Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993).

**71.** *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 257 F.Supp.2d 717, 723 (S.D.N.Y.2003).

**72.** *See id.*

**73.** *Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).

intention' of the parties . . . at the time the contract is formed. . . . The clear and explicit meaning of [the contract's provisions], interpreted in their ordinary and popular sense . . . controls judicial interpretation.[74]

Coverage clauses are interpreted broadly,[75] while "exceptions and exclusions in the insurance policy are strictly construed against the insurer and liberally interpreted in favor of the insured." [76]

## C. Insurers' Duty to Defend

"An insurer has a very broad duty to defend its insured under California law." [77] Such duty "is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded." [78] Specifically, an insurer "must defend a suit which *potentially* seeks damages within the coverage of the policy." [79] While "the insured need only show that the underlying claim *may* fall within policy coverage[,] the insurer must prove it *cannot*." [80] "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." [81]

The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy.[82]

Moreover, "remote facts buried within causes of action that may potentially give rise to coverage are sufficient to invoke the [duty to defend];" [83] the duty to defend is likewise triggered by "facts stated or fairly inferable in the complaint [which] . . . suggest a claim potentially covered by the policy." [84] This is true "regardless of the technical legal cause of action pleaded by the third party." [85] The California Supreme Court has also "recognized that the insured is entitled to a defense if the underlying complaint . . . might be amended to give rise to a liability that would be covered under the policy." [86] As such, an insurer "cannot construct a formal fortress of the [underlying complaint's] pleadings and retreat behind its walls. The pleadings are malleable, changeable and amend-

**74.** *TRB Invs., Inc. v. Fireman's Fund Ins. Co.,* 40 Cal.4th 19, 27, 50 Cal.Rptr.3d 597, 145 P.3d 472 (2006) (quotations and citations omitted).

**75.** *See Montrose Chem. Corp. v. Admiral Ins. Co.,* 10 Cal.4th 645, 667, 42 Cal.Rptr.2d 324, 913 P.2d 878 (1995).

**76.** *Delgado v. Heritage Life Ins. Co.,* 157 Cal. App.3d 262, 270, 203 Cal.Rptr. 672 (1984).

**77.** *Anthem,* 302 F.3d at 1054.

**78.** *Horace Mann Ins. Co. v. Barbara B.,* 4 Cal.4th 1076, 1080, 17 Cal.Rptr.2d 210, 846 P.2d 792 (1993).

**79.** *Gray v. Zurich Ins. Co.,* 65 Cal.2d 263, 275, 54 Cal.Rptr. 104, 419 P.2d 168 (1966) (emphasis in original).

**80.** *Montrose v. Superior Court,* 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (emphasis in original).

**81.** *Horace Mann,* 4 Cal.4th at 1081, 17 Cal. Rptr.2d 210, 846 P.2d 792.

**82.** *Id.*

**83.** *Pension Trust Fund for Operating Eng'rs v. Federal Ins. Co.,* 307 F.3d 944, 951 (9th Cir. 2002).

**84.** *Scottsdale Ins. Co. v. MV Transp.,* 36 Cal.4th 643, 655, 31 Cal.Rptr.3d 147, 115 P.3d 460 (2005).

**85.** *Barnett v. Fireman's Fund Ins. Co.,* 90 Cal. App.4th 500, 510, 108 Cal.Rptr.2d 657 (2001).

**86.** *Montrose v. Superior Court,* 6 Cal.4th at 299, 24 Cal.Rptr.2d 467, 861 P.2d 1153.

able.... [C]ourts do not examine only the pleaded word but the potential liability created by the suit."[87]

 Yet the duty to defend is not unlimited. "[W]here the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability."[88] "[T]he insurer need not defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage."[89] While a court will consider facts fairly inferable from—and potential amendment to—the underlying complaint, "any such amendment must be supported by the facts already pled in the complaint .... [and] [a]n insurer will not be compelled to defend its insured when the potential for liability is tenuous and farfetched."[90] "An insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability"[91] or "speculate about unpled third party claims to manufacture coverage."[92]

### D. Advertising Injury

 For a court to consider an "advertising injury" covered by the liability policy, "it must find that: (1) there is a causal connection between allegations in the third party complaint and the insured's advertising activities; and (2) the allegations in the third party complaint fit into one of the enumerated offenses in the [policy] that could be considered advertising injuries."[93] The "causal connection" prong requires that "any of the policy's enumerated advertising injuries must be *caused by* [the insured's] advertising."[94] That is, "the *advertising activities* must *cause* the injury-not merely expose it."[95] As an example, a claim for patent infringement will not invoke advertising injury coverage where the insured's advertisements "exposed" the alleged infringement by promoting the allegedly infringing product.[96] This is because " 'a patent is infringed by making using, or selling a patented invention, not by advertising it,' "[97] and therefore the advertising could not have caused the injury alleged. By contrast, "infringement of copyright ... typically occurs upon unauthorized reproduction or distribution of protected material.... [T]he injury emanates within the advertisement itself and requires no further conduct."[98]

87. *Gray*, 65 Cal.2d at 276, 54 Cal.Rptr. 104, 419 P.2d 168.

88. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 19, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995).

89. *Gray*, 65 Cal.2d at 275 n. 15, 54 Cal.Rptr. 104, 419 P.2d 168.

90. *The Upper Deck Co., LLC v. Federal Ins. Co.*, 358 F.3d 608, 615 (9th Cir.2004) (quotations omitted).

91. *Gunderson v. Fire Ins. Exch.*, 37 Cal. App.4th 1106, 1114, 44 Cal.Rptr.2d 272 (1995).

92. *The Upper Deck*, 358 F.3d at 615 (quotations omitted).

93. *Homedics, Inc. v. Valley Forge Ins. Co.*, 315 F.3d 1135, 1139 (9th Cir.2003) (citing *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1273–74, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992)). In other words, prong (2) requires that the allegations in the underlying complaint invoke the potential for coverage under the policy as described *supra* Part IV.C.

94. *Simply Fresh Fruit, Inc. v. Continental Ins. Co.*, 94 F.3d 1219, 1221 (9th Cir.1996) (emphasis in original).

95. *Id.* at 1223 (emphasis in original).

96. *Id.* at 1222.

97. *Id.* (quoting *Iolab Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1506 (9th Cir.1994)).

## E. Prior Publication Exclusion

▮▮▮▮ A policy's prior publication exclusion will bar coverage for "any copyright infringement injury that arose from an oral or written publication of material first published before the policy became effective." [99] That is, there is no duty to defend if the allegedly infringing product, *e.g.*, a book, was sold before the insurance coverage began and continued to be sold during the policy period.[100] This is because "[t]he purpose of insurance is to spread risk—such as the risk that an advertising campaign might be deemed tortious—and if the risk has already materialized, what is there to insure? The risk has become a certainty." [101] As such, the prior publication exclusion bars coverage of:

> an insured's continuous or repeated publication of *substantially the same* offending material previously published at a point of time before a policy incepts, while *not* barring coverage of offensive publications made during the policy period which *differ in substance* from those published before commencement of coverage.[102]

"At some point a difference between the republished version of an unlawful work and the original version would be so slight as to be immaterial." [103] But the prior publication exclusion "cannot save the insurer when the republication contains new matter that the plaintiff in the [underlying] suit against the insured alleges as fresh wrongs." [104]

A district court in California interpreted the C & F Policy's prior publication exclusion to bar coverage [105] in a suit against MGA which alleged, in relevant part, copyright infringement based on the Bratz line of products.[106] In an unreported decision, the court determined that the prior publication exclusion precluded coverage because the "thrust of the wrongs" alleged by the underlying plaintiff "began before the relevant policy period" and because "[n]o part of the complaint suggest[ed] that the underlying wrongful actions were different in any substantive manner during 2003." [107] As such, although it was probable that "different advertising occurred" in 2003 than before the policy period began, such a difference in material was irrelevant since—while the "precise characters, fashions, and accessories may have changed,"—there were "no allegations that suggest any advertisement, disparagement, or copyright infringement occurred in 2003 that differed in substance from that which began in or about June

---

98. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 339 n. 3 (9th Cir.1996) (quotations and citations omitted) (citing *Bank of the West*, 2 Cal.4th at 1276, 10 Cal.Rptr.2d at 553, 833 P.2d 545).

99. *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 777 (9th Cir.2009).

100. *See Taco Bell Corp. v. Continental Cas. Co.*, 388 F.3d 1069, 1072–73 (7th Cir.2004).

101. *Id.*

102. *Ringler Assocs. Inc. v. Maryland Cas. Co.*, 80 Cal.App.4th 1165, 1183, 96 Cal.Rptr.2d 136 (2000) (emphasis in original).

103. *Taco Bell*, 388 F.3d at 1073.

104. *Id.* at 1073–74.

105. *See* Unreported Decision in *MGA Entm't, Inc. v. Crum & Forster Specialty Ins. Co.*, No. CV 07–8376 (C.D.Cal.2009) (*"MGA v. C & F"*), Ex. N to C & F's Request for Judicial Notice ("C & F RJN").

106. *See Art Attacks Ink, LLC v. MGA Entm't, Inc.*, 581 F.3d 1138, 1141 (9th Cir.2009).

107. *MGA v. C & F* at 5.

2001." [108]

## F. Bad Faith

 California law "implies in every contract, including insurance policies, a covenant of good faith and fair dealing." [109] To fulfill the implied covenant, "an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests . . . . [and] cannot deny [a claim] without fully investigating the grounds for its denial." [110] "It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer." [111]

 Even if potential coverage exists under the policy, "a court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability." [112] The genuine issue rule, however,

> does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. . . . [A]n insurer is not entitled

to judgment as a matter of law where, viewing the facts in the light most favorable to the [insured], a jury could conclude that the insurer acted unreasonably. [113]

The "denial of a claim on a basis unfounded in the facts known to the insurer, or contradicted by those facts, may be deemed unreasonable. A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim. The insurer may not just focus on those facts which justify denial of the claim." [114]

## V. DISCUSSION

### A. Duty to Defend

#### 1. Allegations of Advertising Injury

 MGA argues that the Insurers had a duty to defend because the Underlying Complaint potentially sought damages for Advertising Injury based on copyright infringement. [115] While MGA acknowledges that the Underlying Complaint did not pursue its claim for copyright infringement expressly on the theory that MGA's Bratz advertising infringed Belair's copyrights, [116] MGA contends that the Underlying Complaint's broad copyright infringement allegations—together with its reference to (and attachment of) infringing "marketing materials"-permit a

---

**108.** *Id.* at 5–6. Notably, the court in *MGA v. C & F* considered June 2001 the date of prior publication since the underlying complaint in that action identified June 2001 as the point in time at which MGA began advertising and selling the Bratz products. *See id.* at 2.

**109.** *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720, 68 Cal.Rptr.3d 746, 171 P.3d 1082 (2007).

**110.** *Id.*

**111.** *Waller*, 11 Cal.4th at 36, 44 Cal.Rptr.2d 370, 900 P.2d 619 (emphasis in original).

**112.** *Lunsford v. American Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir.1994).

**113.** *Wilson*, 42 Cal.4th at 723–24, 68 Cal. Rptr.3d 746, 171 P.3d 1082 (quotations omitted).

**114.** *Id.* at 721, 68 Cal.Rptr.3d 746, 171 P.3d 1082.

**115.** *See* MGA Umbrella Insurers Mem. at 13; MGA C & F Mem. at 12.

**116.** *See* MGA Umbrella Insurers Mem. at 13–14; MGA C & F Mem. at 13.

reasonable inference that the Underlying Action alleged a claim potentially covered by the Policies.[117] The Insurers argue that the Underlying Complaint raised no potential for coverage since it did not expressly state that MGA infringed the Belair copyrights in MGA's advertising, but rather alleged copyright infringement in the creation, "distribution and sale"[118] of the Bratz products.[119] The Insurers maintain that any potential for coverage under the Policies is "predicated on speculation about unpled third party claims,"[120] and that the "dots simply do not connect" between the facts alleged in the Underlying Complaint and a potentially covered Advertising Injury.[121]

Because the Underlying Complaint pleads facts sufficient to raise the possibility of coverage under the Policies, the Insurers' arguments are unavailing. All MGA must do is show that the Underlying Complaint—including remote facts therein, any reasonable inferences drawn from those facts, and potential (but not far-fetched) amendments—included a claim that *may* have fallen within the Policies' Advertising Injury coverage. The Underlying Complaint's plain language alleges facts sufficient to raise the possibility of a potentially covered claim: Its allegations— that the Carter Bryant sketches and all Bratz dolls are substantially similar to the Belair Images—are sweeping, and Belair sought redress based on "*any work* that infringes [his] copyright in the Belair images."[122] The Underlying Complaint, as written, imposed potential liability on MGA for an Advertising Injury since, had Belair's suit been successful, MGA would have infringed the Belair copyrights every time it published or broadcast a Bratz advertisement. That such advertisements existed and would allegedly infringe the Belair copyrights is reasonably inferable from the facts already pleaded in the Underlying Complaint. Specifically, Belair's allegation that the Carter Bryant Sketches, Bratz dolls, Bratz toys, games, and videos all infringe Belair's copyrights, and that "millions" of those products have been sold [123] permits a reasonable inference that the allegedly infringing activities included not just the sale and distribution of the Bratz products, but the advertisement thereof. The Underlying Complaint's reference to allegedly infringing Bratz "marketing materials,"[124] its demand for recovery based on "any work that infringes"[125] the Belair copyrights, including economic damages therefrom,[126] and its demand that MGA cease "publishing"[127] such allegedly infringing materials make it entirely possible that the Underlying Action would seek damages based on an Advertising Injury as defined by the Policies.

117. *See* MGA Umbrella Insurers Mem. at 13–14; MGA C & F Mem. at 12–14.

118. C & F Mem. at 10.

119. *See* Umbrella Insurers Mem. at 9–10; C & F Mem. at 9–10.

120. Umbrella Insurers Mem. at 12 (quotations omitted).

121. C & F Mem. at 12 (quotations omitted).

122. Underlying Complaint at 12 (emphasis added).

123. *See id.* ¶¶ 22, 26.

124. *Id.* ¶ 26. Such allegedly infringing materials were also attached to the Underlying Complaint. *See* Ex. A to Sheridan Decl. at 83.

125. Underlying Complaint at 12.

126. *See id.*

127. *Id.*

554

Finally, the Underlying Complaint might have been amended to give rise to liability that would indisputably be covered under the Policies. The Underlying Complaint's allegations are entirely consistent with a claim for copyright infringement based on Advertising Injury. No further facts would need to be added to bring the Underlying Complaint indisputably within the coverage of the Policies: An amendment adding the word "advertisement" between the words "distributing" and "and" to the sentence "MGA has infringed and will continue to infringe Bernard Belair's copyrighted Belair images by ... distributing and selling the Bratz line"[128] would have done so. The potential for liability based on an Advertising Injury, then, is not tenuous and farfetched.

The Insurers' attempt to liken this case to ones where California courts have found no duty to defend based on the speculative nature of unpled third party claims is unsuccessful. In the cases relied upon by the Insurers, unpled claims were considered speculative because, unlike here, the claims were not supported by facts already alleged in the underlying complaint.[129] Notably, in *Gunderson v. Fire Insurance Exchange*[130] the unpled claims were insufficient to trigger a duty to defend because the underlying complaint's claims would have been contradicted by the very claim that would have triggered that duty.[131]

128. *Id.* ¶ 49.

129. *See, e.g., Ulta Salon, Cosmetics & Fragrance, Inc. v. Travelers Prop. Cas. Co. of America,* 197 Cal.App.4th 424, 127 Cal. Rptr.3d 444 (2011). The insured's policy required the insurer there to defend a suit seeking damages for "bodily injury," and the insurer refused to defend the underlying suit which "solely sought civil penalties ... and injunctive relief." *Id.* at 428, 127 Cal.Rptr.3d 444. The facts alleged in the underlying complaint did not support a claim for bodily injury since it was brought "on behalf of the general public" and did not allege any personal harm to the plaintiff. *Id.* at 432, 127 Cal.Rptr.3d 444. That is, in order to allege a covered injury, the plaintiff in *Ulta Salon* would have had to amend the complaint in several fundamental ways, specifically, by bringing the suit on her own behalf; by including facts alleging that the insured's products caused her injury; and by seeking damages based on that personal harm. Here, no such changes are necessary. *See also Hurley Constr. Co. v. State Farm Fire & Cas. Co.,* 10 Cal.App.4th 533, 12 Cal.Rptr.2d 629 (1992). There, the underlying complaint alleged that the insured conspired with a co-defendant in a scheme to defraud the underlying plaintiff. *See id.* at 536–37, 12 Cal.Rptr.2d 629. The insured's policy provided coverage for claims alleging bodily injury and damage to tangible property, and the underlying suit alleged only economic and punitive damages based on the alleged insurance fraud scheme. *See id.* at 539, 12 Cal.Rptr.2d 629. "No facts ... were alleged to suggest that [the underlying plaintiff] was attempting to recover money paid ... for property damages or personal injuries." *Id.* Moreover, even if such bodily injury or property damage had been alleged, no duty to defend existed because the damages asserted did not arise from an accidental occurrence as required by the policy. *See id.*

130. 37 Cal.App.4th 1106, 44 Cal.Rptr.2d 272 (1995).

131. There, plaintiff in the underlying suit sought quiet title to a piece of real property as well as declaratory and injunctive relief disputing the insured's claim to a right of way easement. *See id.* at 1110, 1115, 44 Cal. Rptr.2d 272. The underlying complaint did not seek damages and specifically alleged that any monetary relief would not adequately compensate plaintiff. *See id.* at 1110, 44 Cal. Rptr.2d 272. As such, the insurer had no duty to defend where the policy provided coverage for "all damage from an occurrence which an insured is legally liable to pay because of ... property damage covered by the [p]olicy." *Id.* (quotations omitted). The underlying complaint contained no facts—nor could any be reasonably inferred—alleging damage to property. *See id.* at 1116, 44 Cal. Rptr.2d 272. In fact, adding such a claim would have "conflicted with [the underlying plaintiff's] claims of title to the right-of-way based on [the insured's] abandonment." *Id.* That is, the amendment of the underlying

Here, the potential liability for damages based on an Advertising Injury is not based on speculative potential facts or on claims that were conspicuously and intentionally never pled; rather, it stems from the Underlying Complaint's sweeping allegations that the entire Bratz line infringed Belair's copyrights; the reasonable inference that such alleged infringement would have been committed in MGA's advertising; and the possibility that Belair could have amended his complaint by adding one word to bring it indisputably within the coverage of the Policies. The potential liability created by the Underlying Action included the possibility that MGA would be found liable for damages based on Advertising Injury.

## 2. Causation Requirement

■ The Insurers argue that, even if the Underlying Complaint included allegations sufficient to infer that MGA allegedly infringed the Belair copyrights in its advertising, the duty to defend was not triggered because the injury did not "aris[e] out of"[132] copyright infringement in MGA's advertisement, *i.e.*, the injury alleged was not caused by the advertising itself.[133] MGA responds that—because in-

jury from copyright infringement in an advertisement emanates within the advertisement itself—any injury caused by such alleged infringement would necessarily have been caused by that advertisement.[134] I agree.

The Insurers' argument is based on the mistaken premise that any MGA advertisement with an allegedly infringing Bratz image on it would merely expose the underlying alleged infringement and not *cause* such infringement. All parties agree that the causal connection requirement is not met where an advertisement merely exposes an underlying injury,[135] but the Insurers fail to recognize that in the context of copyright infringement, the advertisement is not merely the vehicle by which infringement is revealed: The infringement emanates within the advertisement. The distinction between exposing an injury and causing one is illustrated by the cases cited by the Insurers: In suits alleging *patent infringement*, an advertisement for an allegedly infringing product does not cause such injury because, as a matter of law, patent infringement cannot occur in the course of advertising activities.[136] The advertising merely exposes

complaint in *Gunderson* to allege an injury covered by the policy would have undercut the underlying plaintiff's main legal argument.

**132.** C & F Policy at 10. The language of the Umbrella Policies is slightly different, requiring that the injury alleged arose "solely out of" copyright infringement in the insured's advertisement. 2001 Policy at 185. The Umbrella Insurers urge this Court to adopt a more stringent causal connection requirement on the basis of the "solely out of" language. *See* Umbrella Insurers Mem. at 13. Because the California courts have not seen fit to adopt this heightened causal connection requirement, I decline to do so.

**133.** *See* C & F Mem. at 14–16; Umbrella Insurers Mem. at 13.

**134.** *See* MGA Umbrella Insurers Mem. at 14; MGA C & F Mem. at 14.

**135.** *See* C & F Mem. at 17–18; Umbrella Insurers Mem. at 13–14; MGA Mem. at 11.

**136.** *See Iolab*, 15 F.3d at 1505. *See also, e.g.*, *Simply Fresh Fruit*, 94 F.3d 1219. There, the underlying complaint alleged that the insured had infringed the underlying plaintiff's patents in its fruit-cutting device. *See id.* at 1220–21. The court determined that no causal nexus existed between the patent infringement alleged and the insured's advertisement of its fruit-cutting devices, since a patent "is infringed by making, using, or selling a patented invention, not by advertising it." *Id.* at 1222–23. As such, the advertising could not, as a matter of law, cause the alleged injury. *See id.*

the alleged infringement. In contrast, any MGA advertising including images of Bratz products would *constitute* the alleged infringement, not expose it.[137] As such, the causal nexus requirement is met.

## B. Prior Publication Exclusion

Though the Underlying Complaint alleges facts creating potential liability for a covered Advertising Injury, the prior publication exclusion acts to bar coverage under the 2002 and 2003 Policies since it is undisputed that the allegedly infringing Bratz products were first published no later than 2001. MGA argues that the Bratz line cannot be aggregated into a single concept, so that even if the first Bratz product was published prior to the respective policy periods, later infringements could constitute "fresh wrongs"[138] for which the prior publication exclusion does not bar coverage.[139] The Umbrella Insurers argue that the prior publication exclusion bars coverage for 2001 and 2002 because the first Bratz material was published in 2000, and any material published during the policy periods was substantially the same as that first published in 2000 such that the exclusion bars coverage for both years. C & F makes an almost identical argument, but bases it on the premise that "[i]t is undisputed that MGA first began distributing and selling the Bratz line in 2001."[140]

MGA's argument is not persuasive. The prior publication exclusion will not bar coverage where the underlying complaint alleges both infringement of a basic idea published before the policy period *and* infringement of subordinate ideas published during the policy period. But here, the Underlying Complaint made one basic (though sweeping) allegation: that the entire Bratz line infringed all sixteen of Belair's copyrights because all such Bratz products are substantially similar to all of the Belair Images.[141] Had Belair alleged that a particular Bratz doll infringed a particular copyright in 2000 and that a second doll infringed a second copyright in 2002, the latter allegation could constitute a fresh wrong. But he did not—and "the duty to defend is determined by what is charged in the complaint."[142] *Taco Bell* does not support MGA's argument since the premise of Judge Posner's holding was that the "Psycho Chihuahua" concept could not be aggregated for the purposes of the prior publication exclusion precisely because the underlying complaint alleged that the concept included both a "basic idea" and "subordinate but still protected [ ] ideas."[143] The Underlying Complaint here contains no such allegations. While

**137.** The Umbrella Insurers also argue that the causal nexus requirement is not met because the Underlying Complaint alleges only that the Bratz products—not the advertisement thereof—infringed the Belair copyrights. *See* Umbrella Insurers Mem. at 16. The Umbrella Insurers maintain that "[t]he products themselves are not advertisements, however defined." *Id.* However, as discussed *supra* Part V.A.I, the allegations were broad enough to impose potential liability on MGA for copyright infringement in its advertisement of the Bratz products. Moreover, the allegations were not limited to the Bratz products themselves; the Underlying Complaint included as examples of allegedly infringing materials two drawings or graphics of the Bratz dolls meant to advertise or market the products. *See* Ex. A to Sheridan Decl. at 83–84.

**138.** *Taco Bell,* 388 F.3d at 1073.

**139.** *See* MGA Umbrella Insurers Mem. at 15–17; MGA C & F Mem. at 15–16.

**140.** C & F Mem. at 20.

**141.** *See* Underlying Compl. ¶ 26.

**142.** *Taco Bell,* 388 F.3d at 1074.

**143.** *Id.* at 1073.

the insurer cannot invoke the prior publication exclusion where the republication of allegedly infringing material "contains new matter that the plaintiff in [the underlying suit] alleges as fresh wrongs,"[144] so too an insured cannot avoid application of the exclusion by reading into the underlying complaint a degree of specificity or nuance which it never contained.

It is entirely possible—indeed, probable—that alleged infringements occurring during the Policy Periods were different than the alleged infringement which occurred when the first Bratz material was published. But the prior publication exclusion bars coverage when allegedly infringing material which is republished is substantially the same as that which was published before the policy period began. Like the underlying complaint in *MGA v. C & F,* there are no allegations here suggesting that any alleged infringement occurred in 2002 or 2003 that differed in substance from that which began when the allegedly infringing material was first published. As such, the Underlying Complaint alleges no fresh wrongs which would allow this Court to treat alleged infringements occurring during the Policy Periods as distinct from the original alleged infringement for the purposes of the prior publication exclusion.

In relying on the Ninth Circuit's decision *in Mattel Inc. v. MGA Entertainment, Inc.,*[145] MGA conflates the law applicable in copyright infringement suits with the law applicable in duty to defend suits. MGA is correct in stating that, "for the

purposes of copyright infringement, the Bratz cannot be aggregated into a single general concept ... because those are not protectable concepts in dolls. Any copyright claim had to focus on much narrower characteristics."[146] Indeed, that is precisely why the Underlying Action was dismissed on summary judgment.[147] But the question here is not whether the Underlying Complaint alleged legally successful claims—it did not—but rather whether the Underlying Complaint alleged fresh wrongs sufficient to prevent the prior publication exclusion from acting to bar coverage for alleged infringement occurring in 2002 and 2003. Again, it did not. Accordingly, there was no potential for coverage under the Chartis policy issued for 2002 or the C & F policy issued for 2003.

 Nevertheless, the Umbrella Insurers had a duty to defend in the Underlying Action because the extrinsic evidence produced does not conclusively eliminate the potential for coverage under the 2001 Policy. The Umbrella Insurers argue that the prior publication exclusion bars coverage under the 2001 Policy because the first Bratz material was published in 2000, not 2001,[148] This position is, at the very least, debatable. The Umbrella Insurers' argument is disputed by C & F and called into question by evidence showing that the Bratz dolls were first sold in the United States in August 2001[149] and that Certificates of Registration from the Copyright Office reveal the date of publication of the Bryant Sketches to be Febru-

144. *Id.*

145. 616 F.3d 904 (9th Cir.2010).

146. MGA Memorandum in Reply to C & F ("MGA C & F Reply Mem.") at 15.

147. *See Belair v. MGA Entm't,* 831 F.Supp.2d at 694 ("exaggerated and idealized proportions are (distressingly) commonplace in both children's toys and the fashion industry, and Belair cannot assert a protectible claim to them.").

148. *See* Umbrella Insurers Mem. at 18.

149. *See* Larian Aff. ¶ 13.

ary 12, 2001.[150] Because "any factual dispute affecting the existence of [insurance] coverage creates the potential for coverage and a duty to defend,"[151] this Court need not consider whether the first allegedly infringing Bratz material was published in 2000 or in 2001. The mere existence of a factual dispute regarding the first date of publication establishes that the Umbrella Insurers had the duty to defend in the Underlying Action.

### C. Bad Faith

The Insurers argue that MGA's bad faith counterclaim should be dismissed as a matter of law because the Insurers had no duty to defend or, in the alternative, that their refusal to do so was reasonable because there existed a genuine issue as to their duty to defend.[152] MGA responds that summary judgment should be denied because, viewing the facts in the light most favorable to MGA, a jury could conclude that the Insurers acted unreasonably by failing to give sufficient weight to factors which triggered the duty to defend in the Underlying Action.[153]. At the outset, MGA's claim for bad faith against C & F must be dismissed because C & F had no duty to defend the Underlying Action.

■ The bad faith claim against the Umbrella Insurers must also be dismissed because, even considering MGA's version of the facts, there is a genuine issue as to the Umbrella Insurers' duty to defend the Underlying Action under the 2001 Policy. It is undisputed that the Underlying Complaint did not use the word "advertising" or "advertisement," let alone pursue the

copyright infringement claim expressly on the theory that MGA's advertising infringed Belair's copyrights.[154] Moreover, at least some evidence reflects that the first allegedly infringing Bratz material was made known to individuals outside of MGA in 2000.[155] These undisputed facts raise a genuine issue as to (1) whether the Underlying Complaint imposed potential liability on MGA for an Advertising Injury as defined in the 2001 Policy, and as to (2) whether the prior publication exclusion barred coverage in the Underlying Suit. Thus, the Umbrella Insurers did not act unreasonably as a matter of law in refusing to defend MGA in the Underlying Action.

### VI. CONCLUSION

MGA's motion for summary judgment is granted in part and denied in part. The Umbrella Insurers' cross-motion is granted in part and denied in part. Lexington's cross-motion is granted for the reasons stated *supra* pages 542–43. C & F's cross-motion is granted. The Clerk of the Court is directed to close these motions [Docket Nos. 97, 100, 108, 113, 130]. A telephone status conference in this case is scheduled for Wednesday, July 31 at 4:30 p.m.

SO ORDERED.

### *MEMORANDUM OPINION AND ORDER*

### I. INTRODUCTION

Lexington Insurance Company ("Lexington"), National Union Fire Insurance

---

150. *See* Kokes Decl. Ex. C at 27; Ex. D at 34; Ex. E at 50.

151. *Mintarsih,* 175 Cal.App.4th at 284 n. 6, 95 Cal.Rptr.3d 845.

152. *See* C & F Mem. at 24–25; Umbrella Insurers Mem. at 22–24.

153. *See* MGA C & F Reply Mem. at 20–21; MGA Memorandum in Reply to the Umbrella Insurers at 20–21.

154. *See* Underlying Complaint.

155. *See* 2000 Email.

Company of Pittsburgh, PA ("National Union"), American International Underwriters Insurance Company ("AIU"), and Chartis Specialty Insurance Company ("Chartis") (collectively, "Plaintiffs") brought this action seeking a declaration that they were not obliged to defend or indemnify MGA Entertainment, Inc. ("MGA") in connection with an action brought against MGA in this Court,[1] *Bernard Belair v. MGA Entertainment, Inc.* ("Underlying Action").[2] On July 10, 2013, I granted MGA's motion for summary judgment ("Summary Judgment Opinion") in part on the ground that National Union and Chartis ("the Umbrella Insurers") had the duty to defend MGA in the Underlying Action because the extrinsic evidence produced did not conclusively eliminate the potential for coverage under the National Union commercial umbrella policy ("2001 Policy").[3] Specifically, the potential for coverage under the 2001 Policy could not be eliminated because a factual dispute exists regarding the first date of publication of the allegedly infringing Bratz material.[4] The Umbrella Insurers now move for reconsideration.[5]

The Umbrella Insurers make one basic argument in support of their motion for reconsideration, namely, that the Court "overlooked undisputed material facts which establish that the allegedly infringing Bratz materials were first published in 2000."[6] The Umbrella Insurers base this argument on three related arguments: *First,* that the Court's reliance on "evidence showing that the Bratz dolls were first sold in ... 2001 and that Certificates of Registration from the Copyright Office reveal the date of publication ... to be February 12, 2001 is misplaced" because such evidence does not "create an issue as to when the [allegedly infringing] sketches were first made known to the public for the purposes of the prior publication exclusion;" *second,* that the record "does not support the conclusion that Crum & Forster Specialty Insurance Company ("C & F") disputes when the allegedly infringing materials were first published;" and *third,* that MGA does not dispute that the first publication of the Bratz line took place in 2000.[7] For the following reasons, the Umbrella Insurers' motion is denied.

## II. MOTION FOR RECONSIDERATION STANDARD

Motions for reconsideration are governed by Local Rule 6.3 and are committed to the sound discretion of the district court.[8] " [R]econsideration will generally be denied unless the moving par-

---

1. *See* Complaint ("Compl.") ¶ 8.

2. 831 F.Supp.2d 687 (S.D.N.Y.2011), *aff'd,* 503 Fed.Appx. 65 (2d Cir.2012). This Court granted summary judgment to MGA in an action for copyright infringement brought by Bernard Belair, finding that only Belair's particular and original expression of "an absurdly large-headed, long limbed, attractive, fashionable woman" with heavy makeup was protectible, given that generally "exaggerated and idealized proportions are (distressingly) commonplace in both children's toys and the fashion industry." *Id.* at 698, 694. Accordingly, this Court found that Belair's images were not substantially similar to the Bratz line of absurdly-proportioned and heavily made-up dolls. *See id.* at 696.

3. *See* Summary Judgment Opinion at 557.

4. *See id.*

5. *See* the Umbrella Insurers' Motion for Reconsideration of the Summary Judgment Order ("Umbrella Insurers' Mem.").

6. *Id.* at 1.

7. *See id.* at 3–4.

8. *See Patterson v. United States,* No. 04 Civ. 3170, 2006 WL 2067036, at *1 (S.D.N.Y. July 26, 2006) ("The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court.") (citing *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983)).

ty can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'"[9] "Typical grounds for reconsideration include 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"[10] Because "the purpose of Local Rule 6.3 is to 'ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters,'"[11] the Rule must be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court."[12] Such motions should not be made reflexively to reargue "'those issues already considered when a party does not like the way the original motion was resolved.'"[13] A motion for reconsideration is not an "opportunity for making new arguments that could have been previously advanced,"[14] nor is it a substitute for appeal.[15]

## III. DISCUSSION

The Umbrella Insurers' motion fails because they have not demonstrated that this Court committed clear error or overlooked facts or controlling precedent that would have altered the outcome of the Summary Judgment Opinion. Because each of the three grounds asserted by the Umbrella Insurers is based on the same argument—that this Court overlooked dispositive facts demonstrating that the first publication of allegedly infringing Bratz material was in 2000—I address their argument in a single discussion in order to avoid repetition.

In finding a dispute regarding the first date of publication of the allegedly infringing Bratz material, the Umbrella Insurers argue that this Court mistakenly relied upon evidence showing that (1) Bratz dolls were first sold in the United States in 2001 and that (2) the sketches made by Carter Bryant ("Carter Bryant Sketches") bare a publication date of February 12, 2001.[16] Such reliance was not mistaken. As the Summary Judgment Opinion recognizes, under California law, the Umbrella Insurers could only defeat MGA's motion "by producing undisputed extrinsic evidence conclusively eliminating the potential for coverage under the policy."[17] As such, the Umbrella Insurers were required to produce undisputed extrinsic evidence con-

**9.** *United States v. Blumenberg*, 506 Fed.Appx. 53, 54 (2d Cir.2012) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995) (alteration in original)).

**10.** *Gucci Am., Inc. v. Guess?, Inc.*, No. 09 Civ. 4373, 2011 WL 6326032, at *1 (S.D.N.Y. Dec. 16, 2011) (quoting *Virgin Atl. Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992)).

**11.** *Medisim Ltd. v. BestMed LLC*, No. 10 Civ. 2463, 2012 WL 1450420, at *1 (S.D.N.Y. Apr. 23, 2012) (quoting *Grand Crossing, L.P. v. United States Underwriters Ins. Co.*, No. 03 Civ. 5429, 2008 WL 4525400, at *3 (S.D.N.Y. Oct. 6, 2008)).

**12.** *United States v. Treacy*, No. 08 CR 366, 2009 WL 47496, at *1 (S.D.N.Y. Jan. 8, 2009) (quotations omitted).

**13.** *Makas v. Orlando*, No. 06 Civ. 14305, 2008 WL 2139131, at *1 (S.D.N.Y. May 19, 2008) (quoting *In re Houbigant, Inc.*, 914 F.Supp. 997, 1001 (S.D.N.Y.1996)).

**14.** *Associated Press v. U.S. Dep't of Defense*, 395 F.Supp.2d 17, 19 (S.D.N.Y.2005).

**15.** *See RST (2005) Inc. v. Research in Motion Ltd.*, 597 F.Supp.2d 362, 365–66 (S.D.N.Y. 2009).

**16.** *See* Umbrella Insurers' Mem. at 4.

**17.** *Anthem Elec., Inc. v. Pacific Emp'rs Ins. Co.*, 302 F.3d 1049, 1060 (9th Cir.2002).

clusively showing that the first date of publication of the allegedly infringing Bratz products was 2000 and not 2001. The Umbrella Insurers argue that they did so because all of the evidence from 2000— *e.g.*, that the Carter Bryant Sketches bare a publication date of February 12, 2001, and the December 2000 email to the Walmart buying agent ("2000 Email") makes clear that the Carter Bryant Sketches were *not* meant to be made known to the public at that time—is "irrelevant" for purposes of the prior publication exclusion.[18] Tellingly, the Umbrella Insurers do not explain why this evidence is irrelevant, instead simply insisting that such evidence does not "create a dispute as to when the Carter Bryant [S]ketches ... were first made known to the public"[19] for purposes of the prior publication exclusion.

But such evidence does create a dispute. *First*, contrary to the Umbrella Insurers' assertions, it is not "undisputed" that the Carter Bryant Sketches were first published in 2001. In its motion for summary judgment against C & F, MGA based its argument that the prior publication should not bar coverage on the assumption that the "first publication of a Bratz image [was] in 2001."[20] *Second*, the evidence not disputed by MGA from the year 2000[21]

does not conclusively establish that the first publication of Bratz material was in that year, even using the Umbrella Insurers' definition of "publication"—*i.e.*, to make known to the public. The evidence that was undisputed by MGA includes the following: (1) that the Bratz drawings were "first exhibited" in the United States in November 2000, when they were shown to "four or five" retailers;[22] (2) that an MGA employee emailed several of the Carter Bryant Sketches to a Walmart buying agent in 2000, explaining to the agent that they were for that agent's *"reference only;"*[23] and (3) that a then-MGA employee sent a Bratz sculpt to an outside vendor in 2000 in order to "pour a mold" of that sculpt.[24]

█ The Court did not overlook this evidence; rather, the Court disagreed with the Umbrella Insurers' argument that such evidence constitutes conclusive proof of a 2000 first publication date for purposes of the prior publication exclusion.[25] And rightfully so. To argue that Bratz material was "made known to the public" in 2000 because they were shown to a handful of retailers, emailed to a buying agent for that agent's reference, and sent to a vendor to have a "mold" made, is a

---

18. *See* Umbrella Insurers' Mem. at 5–6; Summary Judgment Opinion at 560.

19. *See* Umbrella Insurers' Mem. at 6.

20. MGA's Memorandum of Law in Support of its Motion for Summary Judgment against C & F at 15. Relatedly, the very language of C & F's memorandum of law in support of its cross-motion establishes that C & F disputes that the Bratz material was first published in 2000. *See* C & F Memorandum in Support of its Cross–Motion, Dkt. 114 at 20 ("MGA expressly admits (as it must) that ... the first publication of a Bratz image [was] in 2001.") (quotation marks omitted).

21. The Summary Judgment Opinion makes clear that this evidence was undisputed by

MGA. *See* Summary Judgment Opinion at 542 n. 6, 546–47.

22. *See* MGA's Statement of Genuine Issues in Opposition to the Umbrella Insurers' Cross–Motion for Summary Judgment ("MGA 56.1 Statement"), Dkt. 122 at 11; Declaration of Mark Sheridan, counsel to the Umbrella Insurers ("Sheridan Decl."), at Ex. E 1979:11–25.

23. 2000 Email, Ex. F to Sheridan Decl. (emphasis original).

24. Testimony of Margaret Leahy, Ex. H to Sheridan Decl. at 4154–4155.

25. *See* Summary Judgment Opinion at 557.

stretch. Indeed, in the prior publication cases relied upon by this Court, material was considered first "published" when that material was distributed widely to the public-not when it was in its development phase.[26] As such, the fact that the evidence from 2000 was undisputed by MGA is irrelevant, because that evidence does not conclusively eliminate the possibility that the first date of publication was 2001. Accordingly, the Umbrella Insurers did not meet their burden of "producing undisputed extrinsic evidence conclusively eliminating the potential for coverage under the [2001 Policy]."[27]

## IV. CONCLUSION

For the reasons stated above, the Umbrella Insurers' motion for reconsideration is denied. The Clerk of the Court is directed to close the motion (Dkt. 133).

SO ORDERED.

---

**26.** *See, e.g., Taco Bell Corp. v. Continental Cas. Co.,* 388 F.3d 1069, 1072 (7th Cir.2004) (first publication of allegedly infringing commercials was when those commercials began running on television).

